GREENE, J.
In this case, we address whether the subsequent use of a suspect’s DNA profile,[1] created from a voluntarily provided DNA sample as part of a criminal investigation, implicates Fourth Amendment principles, where a comparison search of the DNA database reveals a match to forensic evidence obtained from the scene of an earlier, unrelated crime. In 2012, Petitioner George Varriale (“Petitioner” or “Varriale”) voluntarily consented to a search of his person, in the form of buccal and penile swabs, for the purpose of furnishing a DNA sample to the Anne Arundel County Police Department during the latter’s investigation of a rape allegation. Although the DNA profile created from the extraction of Varriale’s DNA supported the conclusion that he did not commit the alleged rape, it subsequently connected him to an earlier, unrelated burglary when Varriale’s DNA profile was uploaded to the local DNA database and an automatic search revealed a match to a DNA profile created from the burglary crime scene evidence collected in 2008. Following his indictment on the burglary and related charges, Varriale sought to suppress the DNA evidence as an unlawful search under the Fourth *404 Amendment to the United States Constitution. After the suppression hearing judge denied the motion, Varriale entered into a conditional guilty plea to second degree burglary. He noted a timely appeal of his conviction for burglary. In this case, we shall hold that, where Varriale’s consent to search was not expressly limited by him, by the State, or by law, the Fourth Amendment does not preclude the State from storing and using his voluntarily provided DNA sample and resultant DNA profile for additional, unrelated criminal investigations.[2]
FACTUAL AND PROCEDURAL HISTORY
On the morning of July 10, 2012, Detective David Wood of the Anne Arundel County Police Department responded to a call about an alleged rape in the wooded area behind a liquor store in Glen Burnie, Maryland. Upon his arrival at the *405 scene, he was informed that the patrol officers who originally responded to the call had located a possible suspect named “George,” a homeless man living in a tent in the wooded area behind the liquor store. Detective Wood approached “George,” who then identified himself as George Varriale. Detective Wood identified himself, explained that he was conducting an investigation, and asked Varriale if he would consent to a search of his person. Detective Wood read the Anne Arundel County Police Department’s standard Consent to Search Person Form (“consent form”) to Varriale and placed a completed consent form in front of him for his signature. Varriale agreed to submit to a search of his person in the form of saliva and penile swabs and signed the form. The consent form stated:
Case#: 12-725920
Date: 7-10-12
I, George Varriale, do hereby consent to a search of my person for the purpose of furnishing evidence relating to one or more of the following:

Hair Blood Saliva Fibers Penile Swabs

Pubic Hair Combings Marks or Injuries Fingerprints Photographs

I know that I do not have to consent to a search of my person.
I realize that if I do consent to a body search, that any evidence found to be involved in this investigation, being conducted by the Anne Arundel County Police Department can be used in any future criminal prosecution.
This written consent to search my body is being given by me, George Varriale, to Det. Wood # 1371 and any member of the Anne Arundel County Police Dept. and/or medical personnel, voluntarily, without threat or promise of any kind. I am not under the influence of any intoxicating beverage or drug, which would affect my judgment in consenting.
*406 The words “saliva” and “penile swabs” were circled to denote the areas to be searched for the collection of evidence.[3] Shortly thereafter, an evidence technician collected a sample of Varriale’s saliva and a swab of his penis for DNA testing. Detective Wood did not arrest Varriale, question him further, or contact him again after July 10, 2012.
Detective Wood submitted the swabs collected from Varriale as well as evidence samples obtained from the female complainant to the County crime laboratory for serological and DNA analysis. The crime laboratory issued a report dated December 12, 2012, stating that a partial DNA profile was obtained from fingernail swabs collected from the alleged victim and that Varriale was excluded as a source of that DNA.
Following the analysis and comparison of the known DNA samples, Varriale’s DNA profile was uploaded into the suspect index of the County and State DNA databanks. An automatic search of the County databank compared the DNA profiles of known persons, such as Varriale, to unidentified DNA profiles developed from crime scene evidence. On December 14, 2012, the crime laboratory issued a report to Detective Wood stating that the automatic search resulted in a match between Varriale’s DNA profile and a DNA profile associated with an unsolved commercial burglary that occurred in 2008.
Based on that DNA evidence, on March 29, 2013, Varriale was charged in the Circuit Court for Anne Arundel County with two counts of second degree burglary, theft over $1,000, and malicious destruction of property. Varriale filed a motion to suppress the State’s DNA match evidence, on the grounds that the subsequent use of his DNA to conduct a comparison search of the DNA databank exceeded the scope of his consent and, therefore, constituted an unreasonable search in violation of his Fourth Amendment rights. The Circuit Court held a hearing on Varriale’s motion on August 2, 2013.
*407 At the hearing, Ashley Hayes, a forensic DNA analyst and CODIS Administrator at the County crime laboratory, described the operation of the DNA database system and her analysis of Varriale’s DNA sample. She explained that the County crime laboratory participates in CODIS, the FBI’s Combined DNA Index System, which consists of three tiers: the National DNA Index System (NDIS), the State DNA Index System (SDIS), and the Local DNA Index System (LDIS).[4] Each tier represents a separate database within the combined system, CODIS.[5] Ms. Hayes testified that the Anne *408 Arundel County crime laboratory maintains a local DNA database, or LDIS, containing DNA samples from cases within the County, over which the County maintains ownership, to include any forensic ease work samples and any suspect known samples tested within the County laboratory. She further explained that a “forensic sample” is a DNA sample associated with a crime scene, and a “suspect sample” is a DNA sample taken directly from a known individual who is a suspect in the case. Once samples are uploaded, Ms. Hayes explained, the database program automatically runs a weekly search and generates a report for any matches found within the LDIS, which the laboratory will review prior to determining eligibility for and uploading any DNA profiles to the SDIS or NDIS. Although the NDIS created a “suspect index,” Ms. Hayes testified that the County lab does not upload suspect samples, such as Varriale’s sample, to either the SDIS or NDIS.
Next, Ms. Hayes testified regarding the analysis and treatment of Varriale’s DNA sample. She explained that Varriale’s DNA samples were analyzed to develop a DNA profile and then compared to the DNA profile developed from DNA evidence taken from the alleged rape victim. Ms. Hayes testified, and the lab report states, that there was no match between Varriale’s DNA profile and the DNA profile obtained from the sexual assault evidence kit. Following the direct comparison analysis, and without informing Detective Wood or giving notice to Varriale, Ms. Hayes designated Varriale’s DNA profile as a suspect sample and uploaded it to the LDIS and SDIS.
Following the suppression hearing, the Circuit Court for Anne Arundel County denied Varriale’s motion to suppress the DNA evidence. Thereafter, on August 13, 2013, Varriale *409 entered a conditional guilty plea to the second degree burglary charge, reserving his right to appeal the hearing judge’s ruling on his motion to suppress. The State entered a nolle prosequi of the remaining charges. The Circuit Court sentenced Varriale to four years, suspending all but time served, and placed him on two years’ probation. The same day, Varriale filed an appeal to the Court of Special Appeals.
In a reported opinion, the Court of Special Appeals affirmed, holding that the subsequent examination and use of Varriale’s DNA in an unrelated investigation was not a search for the purposes of the Fourth Amendment. Varriale v. State, 218 Md.App. 47, 54, 96 A.3d 793, 797 (2014). Looking to Varriale’s consent form to determine the scope of his consent, the intermediate appellate court noted that the form was “not a model of clarity” but in “construing] this ambiguity against the State[,] ... the consent form does not contain Varriale’s consent to the use of his DNA in criminal prosecutions that are unrelated to the alleged rape.” Id. Nevertheless, because the subsequent retention and examination of the evidence was not a Fourth Amendment search, the Court of Special Appeals concluded:
Even if Varriale did not unambiguously consent to the use of his DNA in criminal prosecutions that are unrelated to the alleged rape, he unquestionably consented to the taking of a DNA sample .... [and] once the State had validly obtained the sample, ... it had no obligation to obtain a warrant before using the sample in a subsequent investigation.
218 Md.App. at 55, 96 A.3d at 797-98.[6]
We granted both Varriale’s petition for certiorari and the State’s cross-petition, Varriale v. State, 441 Md. 61, 105 A.3d 489 (2014), to answer the following questions:
*410 1. Whether the Fourth Amendment applies to law enforcement’s retention and use, for general investigatory purposes, of Petitioner’s DNA profile collected for a limited purpose?
2. If applicable, whether the Fourth Amendment permits the police to use Petitioner’s DNA profile for a purpose that exceeded the limited terms of consent police relied on to collect Petitioner’s DNA samples?
3. Did Petitioner consent to the collection and subsequent use of his DNA profile?
For the reasons explained below, we hold that the Fourth Amendment did not prohibit the police from using Varriale’s lawfully obtained DNA sample, where he consented to the search without placing an express limitation on his consent, for comparison to other DNA profiles that were unrelated to the rape investigation. Accordingly, we shall affirm the judgment of the Court of Special Appeals.
DISCUSSION
Our standard of review of a trial court’s ruling on a motion to suppress is well established. As we recently explained:
In reviewing a trial court’s ruling on a motion to suppress, an appellate court reviews for clear error the trial court’s findings of fact, and reviews without deference the trial court’s application of the law to its findings of fact. The appellate court views the trial court’s findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress.
Hailes v. State, 442 Md. 488, 499, 113 A.3d 608, 614 (2015) (citations and quotations omitted). The suppression motion in this case addressed the scope of Varriale’s consent to a search of his person for DNA. It is undisputed that Varriale volun *411 tarily consented to the collection of buccal and penile swabs from his body. At issue is to what extent Varriale’s DNA profile, created from analysis of the swabs, may be compared subsequently to other DNA profiles for criminal investigative purposes. In other words, what is disputed is whether the scope of Varriale’s consent was limited to the investigation of one specific incident.
Varriale contends that his consent was limited to the collection and use of his DNA for purposes of the rape investigation alone and that the consent form objectively limits the purpose of the search to the rape investigation. He argues that any use of his DNA for purposes other than the rape investigation would exceed the scope of his consent and constitute a warrantless search in violation of the Fourth Amendment. Thus, in Varriale’s view, the State exceeded the scope of his consent and violated his Fourth Amendment rights when the crime lab entered his DNA profile into the LDIS and compared it to DNA profiles for general criminal investigatory purposes after he had been eliminated as a suspect in the rape investigation.
The State counters that Varriale did not expressly limit his consent, that the consent form indicates that his DNA could be used in “any future prosecution,” to include the burglary prosecution. In addition, the State contests Varriale’s characterization of the crime laboratory’s DNA comparison analysis as a “search” for purposes of the Fourth Amendment. Rather, the State maintains that the subsequent DNA comparison by automatic search was a “future use” of evidence that the police had lawfully obtained by consent, and that “use” does not implicate the Fourth Amendment.

Scope of Consent to Search

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides, in pertinent part, “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.... ” U.S. Const, amend. IV. With regard to a search of a person, the United States Supreme Court has explained that “[v]irtu *412 ally any intrusion into the human body will work an invasion of cherished personal security that is subject to constitutional scrutiny.” Maryland v. King, ___ U.S. ___, ___, 133 S.Ct. 1958, 1969, 186 L.Ed.2d 1, 19 (2013) (citations and quotations omitted). It is undisputed that the State engaged in a “search” when the County evidence technician took buccal and penile swabs to obtain Varriale’s DNA. See King, ___ U.S. at ___, 133 S.Ct. at 1968-69, 186 L.Ed.2d at 19 (“It can be agreed that using a buccal swab on the inner tissues of a person’s cheek in order to obtain DNA samples is a search.”); Raynor v. State, 440 Md. 71, 82, 99 A.3d 753, 759 (2014), cert. denied, ___ U.S. ___, 135 S.Ct. 1509, 191 L.Ed.2d 433 (2015) (same).
Ordinarily, a search of a person conducted without a warrant, such as here, is presumptively unreasonable, unless one of the recognized exceptions to the warrant requirement applies. Relevant to this case is the consent exception. For a consensual search to satisfy the Fourth Amendment, the consent must be voluntary, i.e., free from coercion. See Schneckloth v. Bustamante, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (explaining that to be valid, consent to search must be voluntary, and a reviewing court’s evaluation of “voluntariness” is based on the totality of the circumstances); Jones v. State, 407 Md. 33, 51, 962 A.2d 393, 403 (2008) (“A search conducted pursuant to valid consent, i.e., voluntary and with actual or apparent authority to do so, is a recognized exception to the warrant requirement.”). In addition, “ ‘[a] consensual search may go no further than the limits’ defined by the consent.” Gamble v. State, 318 Md. 120, 129, 567 A.2d 95, 100 (1989) (quoting State v. Jensen, 44 Wash.App. 485, 723 P.2d 443, 446 (1986)). See also 4 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.1(c) (5th ed. 2012) (“When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent.”). In other words, a consensual search may be limited in scope. See Florida v. Jimeno, 500 U.S. 248, 252, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297, 303 (1991) (“A suspect may of course delimit as *413 he chooses the scope of the search to which he consents.”). In this case, Varriale does not dispute that his consent was voluntary. Thus, we shall confíne our discussion to the disputed scope of his consent.
In Jimeno,[7] the High Court explained that “[t]he scope of a search is generally defined by its expressed object.” 500 U.S. at 251, 111 S.Ct. at 1804, 114 L.Ed.2d at 303. In this case, the consent form clearly states that Varriale gave his “consent to a search of [his] person for the purpose of furnishing evidence relating to ... saliva [and] penile swabs.” Although the form does not specify precisely what the police *414 would do with the swabs once the evidence was furnished, “[i]t is undisputed that law enforcement officers analyze DNA for the sole purpose of generating a unique identifying number against which future samples may be matched.” King, ___ U.S. at ___, 133 S.Ct. at 1979, 186 L.Ed.2d at 31.[8] Thus, the “object” of the search was the collection of the DNA swabs for the purpose of identification. See Commonwealth v. Gaynor, 443 Mass. 245, 820 N.E.2d 233, 244 (2005) (“The object of the intended search was a sample of the defendant’s blood and the identifying information that could be obtained by DNA testing of the sample.”).
The consent form further provides that Varriale understood “that any evidence found to be involved in this investigation, being conducted by the Anne Arundel County Police Department can be used in any future criminal prosecution.” Varriale asserts that this form limits the scope of the search to use only in the rape investigation and any potential criminal *415 prosecution related' to that specific investigation. More specifically, he asserts that by signing the form, he conditioned his consent on the restrictions contained therein; in his view, “evidence found in this investigation” meant the investigation of the rape. (Emphasis added.) Varriale contends that the form does not purport to provide general consent, which would impose no restriction on the future use of the DNA evidence.
The State counters that the consent form is not so limiting, and, in fact, the use of the phrase “can be used for any future criminal prosecution” demonstrates consent to any and all subsequent uses of the DNA evidence garnished from the search. In its opinion in this case, the Court of Special Appeals aptly pointed out that the consent form “is not a model of clarity.” 218 Md.App. at 54, 96 A.3d at 797. The consent form demonstrates neither an express limitation on the permitted use of the DNA evidence nor an express consent to any future use. Indeed, the form does not specify what the State would do with the DNA evidence once it was collected (namely, that it would retain the DNA profile and upload it to the LDIS). Unlike the Court of Special Appeals, however, we do not conclude that the form should be construed against the State to mean that there was no consent to the subsequent use and analysis of Varriale’s DNA.
As instructed by the Supreme Court in Jimeno, we apply an objective reasonableness test. See Jimeno, 500 U.S. at 251, 111 S.Ct. at 1803-04, 114 L.Ed.2d at 302 (“The standard for measuring the scope of a suspect’s consent under the Fourth Amendment is that of ‘objective’ reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?”). “[D]etermining what is reasonable requires a factual analysis, ‘examining the totality of the circumstances.’ ” State v. Green, 375 Md. 595, 621, 826 A.2d 486, 501 (2003) (quoting Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347, 354 (1996)).
Varriale argues that no reasonable person would understand that his DNA evidence and/or DNA profile would be indefinitely retained by the State and used in subsequent criminal *416 investigations. We disagree. Both this Court and the United States Supreme Court have explained that DNA profiles are like fingerprints, which police routinely catalog and compare in the course of criminal investigations. See King, ___ U.S. at ___, 133 S.Ct. at 1972, 186 L.Ed.2d at 23; Raynor, 440 Md. at 88, 99 A.3d at 762. In that regard, the Court of Special Appeals has explained:
Once the police are in reasonable possession of the fingerprints, however, those fingerprints are kept on file, ... so that they are available for future criminal investigations. No further Fourth Amendment authorization is required for the police freely to comb such fingerprint banks to seek out and to identify criminals. Indeed, it is difficult to conceive of a modern law enforcement system without such fingerprint banks.
Wilson v. State, 132 Md.App. 510, 549, 752 A.2d 1250, 1271 (2000). The same rationale holds true for the collection and use of DNA. As explained by the Georgia Supreme Court, “like a fingerprint, DNA remains the same no matter how many times blood is drawn and tested and a DNA profile can be used to inculpate or exculpate suspects in other investigations without additional invasive procedures. It would not be reasonable to require law enforcement personnel to obtain additional consent or another search warrant every time a validly-obtained DNA profile is used for comparison in another investigation.” Pace v. State, 271 Ga. 829, 524 S.E.2d 490, 498 (1999).
Our conclusion is consistent with our analysis, supra, regarding what we have defined to be the “object” of the search — namely, the collection of the DNA swabs for the purpose of identification. The rationale of the Supreme Judicial Court of Massachusetts examining this topic is instructive. In Commonwealth v. Gaynor, 443 Mass. 245, 820 N.E.2d 233 (2005), the defendant consented to provide palmprints, fingerprints, and a blood sample while speaking voluntarily with officers at the police station. At the time the defendant came to the station, the police officers were in possession of, and the defendant viewed, a car belonging to a murder victim that had *417 a blood stain on the front passenger seat. Id. at 241. The police submitted the defendant’s blood sample for DNA testing, which revealed his involvement in a total of four rape and murder incidents, including the one victim whose car the defendant viewed at the police station, who turned out to be the fourth victim in the string of incidents. Id. at 239-42. The defendant argued that his consent “was limited by what police told him, namely, that they wanted to test his blood and compare the results with testing done on blood found in the fourth victim’s car.” Id. at 244. Citing Jimeno, the Massachusetts court explained:
Here, a reasonable person likely would have concluded that police were seeking the defendant’s blood tests results, including his DNA profile. The object of the intended search was a sample of the defendant’s blood and the identifying information that could be obtained by DNA testing of the sample. The testing actually done on the defendant’s blood sample was no more intense or intrusive of his privacy interests than what was expressly sought. The scope of the search, blood tests, was confined to what a reasonable person would have understood from the request by police.
Id. Finally, the Gaynor court noted that, “[although it is a suspect’s right to limit the scope of a search to which he consents, [Gaynor] did not avail himself of that right.” 820 N.E.2d at 244 (citation omitted). Therefore, the court held that the scope of the search was not limited to one particular investigation. Id. See also People v. Collins, 250 P.3d 668, 676 (Colo.App.2010) (comparing that case to Gaynor and concluding that where a suspect orally consented to provide police with a DNA sample during an ongoing robbery investigation in Missouri without “limiting] the scope of his consent in any way,” “the scope of the actual search ... was limited to its intended object, namely, a sample of defendant’s saliva for DNA testing[,] ... the typical reasonable person in defendant’s place would have understood that the DNA sample taken from him and the data obtained from analysis of the sample would remain in possession of law enforcement and be available for future law enforcement uses” and therefore the *418 police did not violate the suspect’s rights by subsequently sharing the voluntarily proffered DNA sample with police in Colorado, who thereafter connected the suspect to a “cold” rape case in Colorado).
Looking at the totality of the circumstances of this case, we cannot conclude that the lawful use of Varriale’s DNA was limited only to the rape investigation. It is undisputed that Varriale made no express limitation indicating that his consent was limited to or conditioned upon the DNA evidence being used exclusively in the rape investigation.[9] In addition, nothing in the record indicates that Detective Wood gave any representation whatsoever to Varriale regarding what would happen to his DNA following the analysis required for the rape investigation.[10] Therefore, absent an express limitation placed on the use or storage of the DNA evidence by Varriale, the State, or by law, we cannot conclude that it was unreason *419 able for the State to maintain and utilize Varriale’s DNA for subsequent unrelated investigations.
Although we could end our analysis here, we shall discuss Varriale’s questions concerning the applicability of the Fourth Amendment to the subsequent use of his evidence. As we shall explain, Varriale’s failure to place an express limitation on the use or storage of his DNA sample at the time he provided consent constituted a waiver of any privacy interest in that DNA sample and the State was not prohibited from utilizing his DNA profile in subsequent criminal investigations.

Subsequent Use of Varriale’s DNA

We begin with the proposition that, for the reasons explained above, the DNA evidence was lawfully within the State’s possession after the samples were collected from Varriale’s person. In Raynor v. State, supra, this Court held recently that once the State lawfully possessed a suspect’s DNA, subsequent testing of that DNA does not amount to a Fourth Amendment search. 440 Md. at 96, 99 A.3d at 767. In that case, police suspected Raynor in connection with a rape investigation and invited him to the police station for questioning, which Raynor did of his own volition. Raynor, 440 Md. at 76, 99 A.3d at 755. During questioning, a detective requested that Raynor submit to DNA testing. Id. Raynor refused to consent unless the police agreed to destroy his DNA sample upon completion of the rape investigation, which the police declined to do. Raynor, 440 Md. at 76, 99 A.3d at 756. After Raynor left the station, the officers present observed sweat on the chair in which Raynor had been seated, from which they were able to successfully collect a sample of Raynor’s DNA. Raynor, 440 Md. at 77, 99 A.3d at 756. Forensic DNA analysis confirmed Raynor’s involvement in the rape, for which he was subsequently tried and convicted. Id.
*420 Noting that the petitioner had conceded that the State’s collection of the DNA was lawful, the Court addressed only whether, once the DNA had been lawfully obtained, subsequent police “testing of the identifying loci within that DNA material for the purpose of determining whether those loci match that of DNA left at a crime scene constituted a search under the Fourth Amendment.” Raynor, 440 Md. at 82, 99 A.3d at 759. Relying on the Supreme Court’s explanation in King that the “junk” DNA used in this type of DNA analysis is used only for identification purposes, much like fingerprints, the Majority determined that Raynor “[did] not possess a reasonable expectation of privacy in the identifying characteristics of his DNA.” 440 Md. at 86-88, 92, 99 A.3d at 761-62, 765 (citing King, ___ U.S. at ___, 133 S.Ct. at 1967, 186 L.Ed.2d at 17).
In making this conclusion, the Court in Raynor specifically distinguished United States v. Davis, 690 F.3d 226 (4th Cir.2012), a federal case on which Varriale relies for the proposition that the retention and inclusion of his DNA in the LDIS violated his constitutional rights. In that case, police collected bloody pieces of clothing from Davis when he was in the hospital being treated for a gunshot wound. Davis, 690 F.3d at 230. Four years later, when the police suspected Davis in relation to a murder investigation, police used the bloodstained clothing, still in their possession, to create a DNA profile which was uploaded to the department’s local DNA database. Id. Thereafter, a piece of DNA evidence from another, unrelated murder investigation resulted in a “cold hit” with regard to Davis’s DNA, which was used to prosecute him for the murder. Id. at 232. At trial, Davis moved to suppress the DNA evidence on Fourth Amendment grounds. Id. On appeal of his conviction, the United States Court of Appeals for the Fourth Circuit concluded that Davis retained a privacy interest in his genetic material even though the genetic material was on an item of clothing that was in the possession of and had previously been lawfully obtained by law enforcement. Id. at 246. Therefore, the Fourth Circuit held that the subsequent testing of that DNA was a search for the *421 purposes of the Fourth Amendment. Id. This Court in Ray-nor explained that “[t]he Davis Court’s conclusion that the DNA testing at issue in that case constituted a Fourth Amendment search rested on what may now be a faulty premise, given the discussion in King that DNA analysis limited to the 13 junk loci within a person’s DNA discloses only such information as identifies with near certainty that person as unique.” Raynor, 440 Md. at 90, 99 A.3d at 764. See also Commonwealth v. Arzola, 470 Mass. 809, 26 N.E.3d 185, 194 (2015) (distinguishing Davis and noting that “[t]he Davis court never fully addressed the limited scope of the DNA analysis: to develop a DNA profile that would serve as a genetic fingerprint to be compared with unknown DNA profiles”). Further, we noted that, “because no individual has a reasonable expectation of privacy in his or her identifying physical characteristics!],] [i]t therefore matters not that, at the time of the analysis, [Raynor] was, in the words of Davis, a ‘free person.’ ” Raynor, 440 Md. at 90 n. 9, 99 A.3d at 764 n. 9.[11] In addition, the Court explained, “[Raynor] was not subjected to the forcible collection of his genetic material, or any other bodily intrusion.” 440 Md. at 94, 99 A.3d at 766. Therefore, we held that “law enforcement’s analysis of the 13 identifying loci within Petitioner’s DNA left behind on the chair at the police station, in order to determine a match with the DNA the police collected from the scene of the rape, was not a search, as that term is employed in Fourth Amendment parlance.” 440 Md. at 82, 99 A.3d at 759.
Varriale would distinguish Raynor from this case based on the “degree and scope of intrusion” at issue here, and liken the instant case to the Supreme Court’s decision in Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). In that case, the Supreme Court noted the difference between collecting urine samples for medical purposes as compared to law enforcement purposes, and held that *422 a state hospital’s practice of collecting urine samples for drug testing and reporting positive test results to law enforcement constituted an unreasonable search. Ferguson, 532 U.S. at 83-84, 121 S.Ct. at 1291-92, 149 L.Ed.2d at 219-20. We disagree with Varriale that the analysis in Ferguson controls here, because Varriale indisputably consented to provide his DNA to law enforcement for criminal investigative purposes. See Pharr v. Commonwealth, 50 Va.App. 89, 646 S.E.2d 453, 458 (2007) (concluding that where the suspect “specifically consented to having his DNA taken, tested, and identified for purposes of criminal investigation, ... the principles enunciated in Ferguson are inapposite”).
In addition, as noted in its opinion in this case, the Court of Special Appeals previously discussed the re-examination of DNA evidence in Wilson v. State, 132 Md.App. 510, 752 A.2d 1250 (2000). In that case, law enforcement had lawfully obtained the appellant’s blood sample pursuant to a valid warrant in 1991. Wilson, 132 Md.App. at 531, 752 A.2d at 1262. In 1997, Wilson was a suspect in a rape and abduction investigation. 132 Md.App. at 516-17, 752 A.2d at 1254. In conducting their investigation, law enforcement learned that Wilson’s 1991 blood sample was within their possession and available for re-testing, such that no new or additional blood sample would be necessary. 132 Md.App. at 531, 752 A.2d at 1262. Using the 1991 sample, DNA analysis confirmed Wilson’s involvement in the rape, and he was subsequently convicted.
Before the Court of Special Appeals, Wilson argued that his Fourth Amendment rights were violated when the police tested his 1991 blood sample in 1997 without obtaining a second warrant. Wilson, 132 Md.App. at 543, 752 A.2d at 1268. The court disagreed, stating that “no such fresh authorization is required.” Wilson, 132 Md.App. at 544, 752 A.2d at 1269. Using the DNA/fingerprint analogy (later adopted by the Supreme Court in King, supra), Judge Moylan, writing for the court, explained:
Once an individual’s fingerprints and/or his blood sample for DNA testing are in lawful police possession, that individual *423 is no more immune from being caught by the DNA sample he leaves on the body of his rape victim than he is from being caught by the fingerprint he leaves on the -window of the burglarized house or the steering wheel of the stolen car.... By the same token, photographs, handwriting exemplars, ballistics tests, etc., lawfully obtained in the course of an earlier investigation are freely available to the police in the course of a new and unrelated investigation. No new Fourth Amendment intrusion is involved.
132 Md.App. at 550, 752 A.2d at 1272. Moreover, the court held, once the State had lawfully obtained Wilson’s blood sample pursuant to the 1991 warrant, “[a]ny legitimate expectation of privacy that the appellant had in his blood disappeared.” Id.
Although Wilson involved DNA obtained by a warrant rather than consent, we conclude that, absent an express limitation by the suspect, the same analysis applies to a consent search. See Schneckloth v. Bustamonte, 412 U.S. 218, 243, 93 S.Ct. 2041, 2056, 36 L.Ed.2d 854, 872 (1973) (“The actual conduct of the [consensual] search may be precisely the same as if the police had obtained a warrant.”); Gamble v. State, 318 Md. 120, 129, 567 A.2d 95, 100 (1989) (explaining that the scope of a consent search is “just as broad” as a warrantless search based on probable cause). In its brief in this case, the State correctly points out that, under these circumstances, “[t]he Fourth Amendment is concerned with the way in which the State comes into possession of material, not with its subsequent use of it[.]” Where the Fourth Amendment is not triggered, there is no need for the State to obtain a warrant, nor must the State prove validity under one of the warrant exceptions. See Raynor, 440 Md. at 82-83, 99 A.3d at 759 (“It is bedrock constitutional law that the rights accorded by the Fourth Amendment are implicated only if the conduct of the government officials at issue infringed an expectation of privacy that society is prepared to consider reasonable.”) (citations and quotations omitted). Under the facts of this case, the State lawfully obtained Varriale’s DNA *424 by consent. In providing his consent, Varriale placed no express limitation on the subsequent use or storage of his genetic material and, therefore, as explained above, he waived any potential privacy interest he may have had in that genetic material.[12] Moreover, as explained in Raynor, Varriale has no privacy interest in his identifying information contained in the DNA profile created from lawfully obtained DNA samples which would entitle him to the protections of the Fourth Amendment. Thus, in this case, after the initial search of Varriale’s person to obtain the DNA swabs, the Fourth Amendment was not triggered. Therefore, the State did not need a warrant or Varriale’s additional or express consent in order to conduct further testing of his DNA or upload it to the LDIS for comparison with other DNA profiles.[13]
*425 Therefore, we reject Varriale’s contention that his Fourth Amendment rights were violated when his DNA was uploaded to the LDIS and subsequently used in the burglary investigation and prosecution. We agree with the Court of Special Appeals in this case that “once the State had validly obtained the sample, ... it had no obligation to obtain a warrant before using the sample in [another unrelated] investigation.” Varriale, 218 Md.App. at 55, 96 A.3d at 797-98. Accordingly, we hold that, under these circumstances, the Fourth Amendment does not preclude the police from retaining and using a suspect’s DNA profile created from a DNA sample lawfully obtained by consent.
JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY THE COSTS.
WATTS, J., joins in judgment only.
HARRELL and ADKINS, JJ., dissent.

. This Court explained recently that a "DNA profile” is defined as "[t]he genetic constitution of an individual at defined locations (also known as loci) in the DNA ... [and] [o]nce a DNA profile is prepared, it can be compared with profiles produced by other samples, a process we have previously referred to as ‘DNA profiling.' ” Allen & Diggs v. State, 440 Md. 643, 660, 103 A.3d 700, 710 (2014) (citing Young v. State, 388 Md. 99, 110, 879 A.2d 44, 50 (2005)).

. The dissenting opinion assails the analysis and conclusions of the majority opinion on several fronts. In doing so, the dissenting opinion refuses to accept three basic propositions of law: (1) that Varriale’s consent to the search of his body and the analysis of his DNA stems from his voluntary consent, which provided the same authority to law enforcement as if his DNA had been collected pursuant to a search warrant; (2) that by consenting to a search of his person and DNA, as he did, Varriale waived any reasonable expectation of privacy in his DNA for future comparison in other cases; and (3) that only one search occurred in this case, a conclusion which is based squarely within the law as explained recently by both this Court and the United States Supreme Court. As we explain in this opinion, the United States Supreme Court explained the law concerning DNA identification in Maryland v. King, ___ U.S. ___, ___, 133 S.Ct. 1958, 1972, 186 L.Ed.2d 1, ___ (2013) (noting that "the use of DNA for identification is no different than matching an arrestee's face to a warrant poster of a previously unidentified suspect; ... or matching the arrestee’s fingerprints to those recovered from a crime scene”), and this Court subsequently interpreted that law in Raynor v. State, 440 Md. 71, 82, 99 A.3d 753, 759 (2014), cert. denied, ___ U.S. ___, 135 S.Ct. 1509, 191 L.Ed.2d 433 (2015) (holding that the DNA testing of the defendant’s genetic material collected from the armrest of a chair at a police station and comparison of the 13 identifying loci in order to determine a match with DNA the police collected from the scene of the rape was not a "search” for Fourth Amendment purposes). Applying the principles announced in those cases, we conclude here that Varriale’s consent opened the door to all that took place, and we do not subscribe to the dissenting opinion’s view that there should exist a separate set of rules governing the use of DNA in "cold cases.”

. It is undisputed that Varriale consented to a search of his person for the purpose of obtaining DNA samples.

. Pursuant to the Maryland DNA Collection Act, Md. Code (2003, 2011 Repl. Vol., 2014 Supp.), § 2-501 ei seq. of the Public Safety Article ("PS”), Maryland cooperates with the FBI’s CODIS program. "CO-DIS” is defined by PS § 2-501(c) as "the Federal Bureau of Investigation’s 'Combined DNA Index System' that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories!,]” and "includes the national DNA index administered and operated by the Federal Bureau of Investigation.” See also Federal Bureau of Investigation, Frequently Asked Questions (FAQs) on the CODIS Program and the National DNA Index System, http://www.fbi. gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited July 30, 2015) ("CODIS ... is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases. The National DNA Index System or NDIS is considered one part of CODIS, the national level, containing the DNA profiles contributed by federal, state, and local participating forensic laboratories.”).

. In Maryland v. King, the United States Supreme Court described the nature and function of CODIS:
Authorized by Congress and supervised by the Federal Bureau of Investigation, the Combined DNA Index System (CODIS) connects DNA laboratories at the local, state, and national level. Since its authorization in 1994, the CODIS system has grown to include all 50 States and a number of federal agencies. CODIS collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes. To participate in CODIS, a local laboratory must sign a memorandum of understanding agreeing to adhere to quality standards and submit to audits to evaluate compliance with the federal standards for scientifically rigorous DNA testing.... In short, CODIS sets uniform national standards for DNA matching and then facilitates connections between local law enforcement agencies who can share more specific information about matched ... profiles.
___ U.S. ___, ___, 133 S.Ct. 1958, 1968, 186 L.Ed.2d 1, 18-19 (2013) (citations omitted). Federal and Maryland state law, respectively, spec *408 ify and limit what types of DNA evidence can be uploaded to the NDIS and SDIS. See 42 U.S.C. § 14132 (governing entry of DNA evidence into the national databank, or NDIS); PS §§ 2-504 and 2-506 (governing collection and maintenance of DNA samples in the Maryland State databank, or SDIS). These statutes, however, do not encompass or regulate local databases, or LDIS.

. The Court of Special Appeals also addressed the applicability of the Maryland DNA Collection Act under these circumstances, and held that the Act’s "statutory protections do not extend to persons in Varriale’s position.” Varriale, 218 Md.App. at 59, 96 A.3d at 800. This issue has *410 not been challenged before this Court and therefore we do not address it.

. Florida v. Jimeno is the seminal Supreme Court case governing scope of consent for a Fourth Amendment search. In that case, a law enforcement officer suspected Jimeno of illegal drug trafficking and followed Jimeno in his vehicle. Jimeno, 500 U.S. at 249, 111 S.Ct. at 1803, 114 L.Ed.2d at 301. Upon witnessing Jimeno fail to stop before turning right at a red light, the officer pulled him over. Id. On the side of the road, the officer explained that he had reason to believe Jimeno was in possession of illegal narcotics and requested permission to search his vehicle, which Jimeno granted. Jimeno, 500 U.S. at 249-50, 111 S.Ct. at 1803, 114 L.Ed.2d at 301-02. While conducting the search, the officer found and opened a brown paper bag, which contained a kilo of cocaine. Jimeno, 500 U.S. at 250, 111 S.Ct. at 1803, 114 L.Ed.2d at 302. Thereafter, Jimeno was charged with possession with intent to distribute. Id. Before trial, Jimeno filed a motion “to suppress the cocaine found in the bag on the ground that [his] consent to search the car did not extend to the closed paper bag inside of the car.” Id. The motion was granted, and the case made its way to the United States Supreme Court "to determine whether consent to search a vehicle may extend to closed containers found inside the vehicle.” Id. Under the facts of that case, the Court concluded:
[T]he terms of the search’s authorization were simple. [Jimeno] granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search. Trujillo had informed Jimeno that he believed Jimeno was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent’s car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. Contraband goods rarely are strewn across the trunk or floor of a car. The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car’s floor.
*414 500 U.S. at 251, 111 S.Ct. at 1804, 114 L.Ed.2d at 303 (citation omitted).

. We note briefly that identification is a key component to our analysis of DNA cases. As noted by the State in its brief, the State analyzes DNA evidence to obtain DNA profiles derived from the non-coding regions of DNA, commonly referred to as "junk DNA.” "Although highly useful for identification purposes, junk DNA 'does not show more far-reaching and complex characteristics like genetic traits.’ ” Raynor, 440 Md. at 86, 99 A.3d at 761 (quoting King, ___ U.S. at ___, 133 S.Ct. at 1967, 186 L.Ed.2d at 17). For that reason, discussed further infra, this Court held in Raynor that an individual does not retain a privacy interest in his DNA profile, once it is lawfully possessed by the State, which would entitle him or her to the protections of the Fourth Amendment. Raynor, 440 Md. at 96, 99 A.3d at 767 (“In the end, we hold that DNA testing of the 13 identifying junk loci within genetic material, not obtained by means of a physical intrusion into the person’s body, is no more a search for purposes of the Fourth Amendment, than is the testing of fingerprints, or the observation of any other identifying feature revealed to the public — visage, apparent age, body type, skin color.”). It is noteworthy, however, that the Supreme Court has cautioned that "[i]f in the future police analyze samples to determine, for instance, an arrestee’s predisposition for a particular disease or other hereditary factors not relevant to identity, that case would present additional privacy concerns not present here.” King, ___ U.S. at ___, 133 S.Ct. at 1979, 186 L.Ed.2d at 31.

. Varriale urges us to rely on State v. Binner, 131 Or.App. 677, 886 P.2d 1056 (1994), an Oregon intermediate appellate court case, for the proposition that a DNA sample taken for one purpose cannot be used subsequently for a different purpose without offending the Fourth Amendment. In Binner, police suspected the defendant to be intoxicated after he was involved in a fatal car accident. Id. at 1057. Upon request by the police, the defendant consented to provide a blood sample for alcohol testing but specifically refused to provide a urine sample for drug testing. Id. The Oregon court held that the police violated the defendant's Fourth Amendment rights when the blood sample was subsequently submitted to a drug test. Id. at 1059. That holding, however, was based on the defendant's express refusal to submit to drug testing. Id. Thus, Binner is inapposite to this case, because Varriale placed no express limitation on his consent to the search.

. If, as a basis to obtain Varriale’s consent to search, Detective Wood had made any statements or promises to Varriale regarding the retention or use of his DNA, our analysis might be different. For example, deceit or misrepresentation by a police officer to obtain consent to search may negate the voluntariness of the consent. See Redmond v. State, 213 Md.App. 163, 186, 73 A.3d 385, 399 (2013) (holding that, where police intentionally misrepresented their purpose to gain entry to a house by consent, the search was invalid for two reasons: (1) the consent was involuntary; and (2) the scope of consent was limited by the officers' misrepresented purpose to gain entry). In addition, at least one court has held that a police officer is not required to inform or explain to a suspect that his DNA evidence may be retained indefinitely *419 by police. See Pace v. State, 271 Ga. 829, 524 S.E.2d 490, 498 (1999) ("The police were not required to explain to Pace that his blood or hair could be used in prosecutions involving other victims, or that he had a right to refuse consent.”). We agree that under the circumstances, no such explanation was necessary.

. Similarly, Varriale’s reliance on the fact that he is not an individual with "diminished rights,” such as an arrestee or convicted person, to support his argument that the State violated his Fourth Amendment rights is not relevant to our analysis.

. We make note of two other points. First, the dissenting opinion’s suggestion that Varriale's privacy rights were somehow restored to full vigor once the department’s DNA analysis revealed that Varriale was excluded as a possible suspect in the rape investigation is pure fiction. Once Varriale consented to the search in this case, any reasonable expectation of privacy in his identity essentially evaporated. It did not reappear once he became a suspect in another crime.
Second, because our analysis rests on the conclusion that Varriale did not place any limitations on the use of his DNA, we need not decide what protections a suspect may have in a case involving a consensual search where the suspect does in fact place an express limitation on the use of DNA evidence and the State has conceivably exceeded the scope of consent given. We leave that question for another day.

. Other courts have reached the same conclusion. See, e.g., Washington v. State, 653 So.2d 362, 364 (Fla.1994) (holding that, where defendant "freely and voluntarily provided [detectives] with hair and blood samples .... the samples were validly obtained, albeit in an unrelated case, [and] the police were not restrained from using the samples as evidence in the murder case”); State v. Hauge, 103 Hawaii 38, 79 P.3d 131, 145 (2003) ("[R]egardless of the number of times that the [police] tested Hauge’s blood sample for its DNA, no violation of his constitutional right to privacy occurred because the analyses did not exceed the objective for which the original warrant was sought — DNA testing for the purpose of identification.”); Smith v. State, 744 N.E.2d 437, 439 (Ind.2001) (“[0]nce DNA is used to create a profile, the profile becomes the property of the Crime Lab[,] [t]hus, Smith had no possessory or ownership interest in it."); State v. Bowman, 337 S.W.3d 679, 685 (Mo.2011) ("Fourth Amendment analysis focuses on the intrusiveness of the initial search, not on the subsequent use of information obtained *425 from that search.... [Tjhe subsequent use of the DNA sample obtained from the valid [consensual] search and seizure does not constitute a Fourth Amendment violation.”); State v. Notti, 316 Mont. 345, 71 P.3d 1233, 1238 (2003) (“We conclude that Notti waived any reasonable expectation of privacy in the DNA profile created by the Crime Lab. After the initial withdrawal of blood, obtained pursuant to the initial sexual assault investigation, there was simply no subsequent search or seizure of Notti’s person such that Notti could invoke a privacy interest or right.”).