In the Circuit Court for Anne Arundel County
Case No. 02-K-14-001188

**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1172

September Term, 2015

_____

BRIAN GRIMM

v.

STATE OF MARYLAND

_____

Meredith,
Graeff,
Friedman,

JJ.

_____

Opinion by Meredith, J.

_____

Filed: April 26, 2017

Brian Grimm, appellant, urges us to hold that the Circuit Court for Anne Arundel County erred in denying his motion to suppress evidence, namely, the heroin that was found in his automobile during a search conducted after an alert by a drug-sniffing dog. Grimm argues that the suppression court erred in concluding that the dog was reliable and that the dog's alert provided probable cause for the police officer to search the vehicle. Grimm entered a conditional guilty plea (to possession of heroin with intent to distribute), reserving the right to challenge the denial of his motion to suppress. After he was convicted and sentenced, he noted this direct appeal.

## QUESTIONS PRESENTED

Grimm presents three questions for our review:

I. Did the circuit court err in finding that there was probable cause to search Appellant's vehicle without a search warrant?

II. Does the good faith exception to the warrant requirement apply?

III. Did the lower court err in admitting testimony and documents pertaining to the certification of the canine that scanned Appellant's vehicle, where the certification occurred four months after the scan occurred?

We answer "no" to Questions I and III, which obviates the need for us to address Question II. We will affirm the judgment of the Circuit Court for Anne Arundel County.

## FACTUAL & PROCEDURAL BACKGROUND

On April 18, 2014 -- one day prior to the traffic stop of Grimm's vehicle -- Sergeant Christopher Lamb, of the Maryland Transportation Authority Police, received a tip from a federal drug enforcement program referred to as "HIDTA," advising that a suspect named Brian Grimm "may be traveling northbound on Interstate 95 from Atlanta, Georgia to the

1

area of Baltimore, Maryland . . . with a large quantity of CDS."[1]  Sgt. Lamb's contact at HIDTA provided descriptive information about Grimm, including his race and approximate age.  The following day, while Sgt. Lamb was on patrol, he received telephone calls from HIDTA providing additional information about the suspect: the vehicle of interest was a maroon Honda with Georgia registration, carrying multiple occupants, and it was traveling in Anne Arundel County in the vicinity of the Arundel Mills shopping complex, on Maryland Route 100, about to turn onto Route 295 North, toward Baltimore.

Sgt. Lamb spotted a vehicle matching the description provided by HIDTA, *i.e.*, a maroon Honda with Georgia tags traveling northbound toward Baltimore on Route 295. When Sgt. Lamb observed that none of the occupants of the Honda were wearing seatbelts, he initiated a traffic stop of the vehicle.  Grimm was driving the maroon Honda at the time of the stop; there was one passenger in the front seat, and a second passenger in the back seat.  After stopping the vehicle, Sgt. Lamb noted that the front seat passenger would not look at him, and she stared straight ahead throughout the traffic stop.  But the back seat passenger seemed "overly polite" throughout the stop.

When Sgt. Lamb asked the driver about his travel itinerary, Grimm explained that he had just purchased the Honda in Atlanta, and that he had flown from Baltimore to

---

[1] "HIDTA" stands for High Intensity Drug Trafficking Area. The HIDTA Program is "a federal grant program administered by the White House Office of National Drug Control Policy, which provides resources to assist federal, state, local and tribal agencies coordinate activities that address drug trafficking in specially designated areas of the United States." Office of National Drug Control Policy, *HIDTA*, http://www.hidta.org/ (last visited April 24, 2017).

Atlanta to pick up the vehicle and also to visit friends in the Atlanta area.  Grimm further explained that he had been driving all night to return to the Baltimore area.  Grimm possessed a Maryland driver's license, and the vehicle had been registered two days earlier, but it was not registered in Grimm's name.  Grimm explained that he did not have enough money to register the vehicle in his own name because he had purchased four airline tickets from Baltimore to Atlanta in order to pick up the vehicle.

Sgt. Lamb testified at the suppression hearing that he asked Grimm to exit the vehicle because he had detected several indicia of possible criminal activity:

> The rear seat passenger was over-polite. The front seat passenger was staring forward, she wouldn't speak with me, she wouldn't make eye contact with me. The driver was traveling from source city to source city for drugs ---- meaning Atlanta, Georgia, which is a source city of drugs to Baltimore City which is a source city of drugs. The fact that they had flown down four individuals from Baltimore, Maryland to Atlanta, Georgia, purchased a vehicle, but then the operator Mr. Grimm who stated [he was] to be the owner was not able to afford to put that vehicle in his name, register that vehicle in his name when he drove it back. And the totality of those things . . . .

While speaking with Grimm, Sgt. Lamb observed that Grimm looked "disheveled" and "unkempt like he had been on the road and hadn't been staying anywhere."  Sgt. Lamb felt that Grimm was "mumbling" and "rambling" when answering questions, and would "look away, and then look back" at Lamb throughout their conversation.  Grimm did not, however, appear to be nervous.  Sgt. Lamb eventually instructed Grimm to reenter his vehicle.  While Sgt. Lamb was writing the seat-belt warnings to be issued to the occupants of the Honda, he noticed that Grimm "never fully closed his door when he got into his vehicle," and he "maintained his left foot out of the vehicle and on the asphalt."  Sgt. Lamb considered Grimm's conduct "very unusual," and thought that it indicated that Grimm

3

might be a "flight risk." Nevertheless, Sgt. Lamb testified that he did not believe he had probable cause to search Grimm's vehicle at that point.

While Sgt. Lamb was still in the process of writing out the warnings, Maryland Transportation Authority Police Officer Carl Keightley arrived with his drug-detection dog, a Malinois named "Ace." Officer Keightley had been Ace's handler since 2012. They had gone through an initial three-month training period, and Ace had been trained to detect heroin, methamphetamine, MDMA, marijuana, and cocaine. Both the dog and the handler had been certified by the Maryland Transportation Authority Police through testing in various situations, including searches of buildings, luggage, vehicles, and open areas. Officer Keightley and Ace held current certifications when they were called to scan Grimm's vehicle on April 19, 2014, having been most recently recertified by the Maryland Transportation Authority Police on January 22, 2014.

Officer Keightley and Ace conducted an exterior scan of Grimm's vehicle, and Ace gave a positive alert to the presence of narcotics. Officer Keightley testified that, while he was leading Ace around the vehicle, Ace jumped up and stuck his head inside of the driver's side window, sniffed, and sat, which was Ace's "final alert" to the presence of narcotics. Sgt. Lamb then searched Grimm's vehicle, and discovered a "large quantity of heroin and amphetamine" hidden in the rear panel of the passenger side door. Grimm was arrested and charged with possession with intent to distribute heroin (and other related offenses that are not material to this appeal).

In the circuit court, Grimm moved to suppress the evidence discovered during the search, and contended that Sgt. Lamb lacked probable cause to search his vehicle. The

4

court held a lengthy evidentiary hearing on the motion. Both sides argued that their respective positions were supported by the Supreme Court's opinion in *Florida v. Harris*, ___ U.S. ___, 133 S.Ct. 1050 (2013), in which the Court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," but also said that a defendant "must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id.*, 133 S.Ct. at 1057. Grimm urged the suppression court to find that Ace was not a reliable drug-detection dog, that his training was deficient, and that his purported alert therefore did not provide support for Sgt. Lamb's belief that he had probable cause to search the vehicle.

During the suppression hearing, each side called two expert witnesses. Officer Keightley (Ace's handler) was accepted by the court as an expert in the field of K-9 police dogs and the detection of heroin, marijuana, cocaine, MDMA, and methamphetamine. Officer Keightley explained that he generally trains with Ace one day each week in various scenarios designed to mimic situations they might encounter in the field. The State introduced in evidence written records of training conducted with Ace during 2012, 2013, and 2014. During Officer Keightley's testimony, the State also introduced the field reports that had been completed by Officer Keightley after each drug scan performed by Ace. Officer Keightley explained that the Maryland Transportation Authority Police has generated K-9 certification guidelines, and that Ace had first been certified in 2012, and was thereafter recertified every six months. The initial certification of Ace was performed by Officer Michael McNerney (who would later be called by Grimm as an expert witness

5

at the suppression hearing). After reviewing with the court the dash-cam video recording of the scan of Grimm's Honda, Officer Keightley reiterated that Ace gave an alert indicating that he had detected the odor of narcotics in the vehicle.

During cross-examination of Officer Keightley, Grimm's counsel reviewed with the officer the fact that the field reports reflected that Ace had given positive alerts to vehicles during 51 scans, but no contraband was found in 19 of those vehicles. Officer Keightley had interviewed the occupants of those 19 vehicles and had been told by occupants of ten of the vehicles that, in fact, drugs had recently been present in those vehicles. On redirect examination, Officer Keightley said that there were several possible explanations other than error on the part of the dog that might explain why no drugs were found on the nine other occasions on which Ace had alerted:

> [S]omething might have [actually] been in the vehicle and it might not have been located [during the search]. Somebody might have used narcotics recently in the vehicle or used narcotics and touched the vehicle, contaminated the vehicle. Any of those things.

Officer Keightley conceded on cross-examination that, although he generally conducted weekly training with Ace, because of the manner in which he had routinely logged training time before his supervisor mandated a change, the hours he had spent each month had not met the organization's standard until some point in time after the scan of Grimm's vehicle. He acknowledged that he had not spent 16 hours of actual "sniff time" training with Ace in any of the six months leading up to April 19, 2014.

The State also presented testimony from Sergeant Mary Davis, who was a police supervisor and narcotics-detection dog trainer for the Montgomery County Police

6

Department. She had been working in that police department's canine unit for over twenty years, and had been the head trainer since 2008. She indicated that, although the State of Maryland does not mandate any particular standards for the performance of drug-detection dogs, she was very familiar with the standards recommended by the United States Police Canine Association and other similar organizations. Defense counsel stipulated that Sgt. Davis "is an expert in K-9 training and K-9 handling."

Sgt. Davis testified that the State of Maryland does not require certification of police dogs, but both the Montgomery County Police Department and the Maryland Transportation Authority Police had adopted requirements for certification and periodic recertification. She confirmed that the certification protocol adopted by the Maryland Transportation Authority Police does "generally comport with industry standards." In August 2014, Sgt. Davis and two other officers from the Montgomery County Police Department had conducted an evaluation of the canine teams at the Maryland Transportation Authority Police. Officer Keightley and Ace were tested on that occasion, and they passed the testing conducted by the officers from Montgomery County.

Sgt. Davis further testified that she had reviewed all of the training records that Officer Keightley had maintained for Ace, covering training exercises during 2012 through July of 2014. She saw that, during 2013, Ace had participated in 209 training scenarios in which drugs had been hidden, and during those exercises, Ace had had 24 non-productive responses (sometimes referred to as "NPRs" by dog trainers, and referred to as false alerts by defense counsel). Sgt. Davis said that she would not characterize "any one particular amount [of NPRs] as acceptable or unacceptable."

7

With respect to the 51 field scans that had been performed by Ace, Sgt. Davis testified that the fact that no drugs were discovered in nine vehicles (for which the follow-up interviews provided no explanation) would not concern her, "Not even in the least bit." In her view, even though there was no admission of the prior presence of drugs in those vehicles, the vehicles could have been previously used to transport drugs. She said: "So I would not be shocked that we didn't [get] an admission and we weren't able to find target odor. That can occur very easily." Furthermore, Sgt. Davis considers a dog's training records more useful than the field records because training typically occurs in a more controlled environment.

Based upon her review of the dash cam video recording of the scan of Grimm's vehicle conducted by Officer Keightley and Ace, Sgt. Davis expressed an opinion that Ace clearly alerted to the presence of drug odor, and she saw no evidence that the handler cued the dog to alert. Sgt. Davis rejected defense counsel's suggestion that Ace may have exhibited a false alert at Grimm's driver-side door simply to get a reward. She explained: "It looked to me that the dog was working independently to odor. And once he got into the odor he gave the indication." She agreed that, in her experience, she had observed some dogs give a false alert just for a reward, but, she said: "I don't see that that's what occurred here."

When asked directly if she had an opinion regarding the "overall competence of the team of Officer Carl Keightley and K-9 Ace," Sgt. Davis testified that, "[b]ased on the totality of the circumstances, looking at all of the training records in their totality, and having observed the team personally on three separate occasions," she believed that "they

8

are competent to be working the street and deploying, and making probable cause decisions on the street." When asked, on cross-examination, to comment upon the strength of Ace's abilities, Sgt. Davis said: "He has a tremendous skill set. He's got a lot of drive. He has a huge work ethic."

The defense likewise called two canine experts as witnesses. Ted Cox was a retired police officer who had extensive experience as a K-9 trainer for the Baltimore City Police Department, including six years as chief trainer. He had also been employed as the K-9 trainer for the Maryland Transportation Authority Police from 2007 to 2012. The State stipulated that he was an expert in K-9 training and handling.

Mr. Cox had analyzed Ace's training records for the period covering April 15, 2013, through March 24, 2014, and concluded that, by his count, Ace had been put through 179 scenarios, and had made 44 false alerts, which Mr. Cox viewed as unacceptable. He also criticized Ace for "excessive barking" during the approach to Grimm's vehicle. Mr. Cox expressed opinions that were critical of Ace's training as reflected in the training records, and he believed that Ace should not have been recertified on August 19, 2014, because of a false alert the dog gave during that testing.

He concluded that Ace's hours of training, as recorded prior to the scan of Grimm's vehicle, did not meet "the industry standard," and he said, "after reviewing the records and the dash cam video, it's my opinion that the dog is unreliable at this point." In his opinion, Ace did not alert to the odor of the drugs that were later found in the car, but instead alerted to the "human scent" of the occupants of the car, in particular, Grimm, who had been

9

resting upon the driver-side door for several minutes prior to the scan. Mr. Cox reiterated: "There is no doubt in my mind that the dog is unreliable."

The second dog expert called by the defense was Senior Officer Michael McNerney, who had been a trainer for the Maryland Transportation Authority Police since 2009, and had worked under Ted Cox until the end of 2012. Officer McNerney then became the head trainer for explosives-detection dogs, and in September 2013, Officer McNerney assumed the additional responsibility for training of narcotics-detection dogs as well. He was accepted by the court as an expert in the field of canine training and handling.

Officer McNerney explained that, in March 2014, when he reviewed the training records for Officer Keightley and Ace, the records did not reflect that that team had met the Transportation Security Administration's standard requiring 240 minutes of "sniff time" in training each month. As a consequence of that discovery and other concerns Officer McNerney had communicated to his superiors regarding training deficiencies in the canine unit, Officer McNerney "stepped down" from his position as head trainer on March 11, 2014. But he was ordered back to the position in May 2014.

When Officer McNerney resumed the position of head trainer in May 2014, he "decertified" Ace and Officer Keightley because of the manner in which Officer Keightley (and other officers in the K-9 unit) had been recording their training hours. Nevertheless, Ace and Officer Keightley were recertified by Officer McNerney just two days later. Despite acknowledging that he had recertified Officer Keightley and Ace in May 2014, Officer McNerney testified that he had observed several problems with the manner in which Officer Keightley trained with Ace, including "cuing," "object focusing," and "a lot

10

of falsing issues," in addition to inadequate sniff time. He also reported that he was concerned that the drug samples that were being hidden as training aids for the dogs to find had become stale, and he had replaced several of the samples during the summer of 2014 after a chemist's analysis confirmed that the sample drugs being used for training contained "significant impurities."

On cross-examination, Officer McNerney acknowledged that, after he became head trainer (in September 2013), he had personally conducted recertification testing of Officer Keightley and Ace in January 2014, and he had certified that they passed the test on January 22, 2014. Pursuant to Maryland Transportation Authority Police standard operating procedures, recertification is supposed to occur every six months. Consequently, the January 22, 2014, certification would have been current and "in effect" at the time of the scan of Grimm's vehicle on April 19, 2014. Officer McNerney also acknowledged that he had been "involved with" the initial certification of Officer Keightley and Ace back in 2012, and that they passed the initial certification test on the first try.

After the close of evidence at the suppression hearing, defense counsel argued that, based upon the training records and field performance records for Ace and Officer Keightley, the court should find that Ace was not a reliable drug-detection dog on April 19, 2014, and that his alert to narcotics therefore did not provide probable cause to conduct a warrantless search of Grimm's vehicle. Grimm also disputed whether Ace actually alerted to contraband at all during the stop. The State countered that the evidence established that Ace was well-trained and certified, and was therefore reliable, which meant that, under

*Florida v. Harris*, Sgt. Lamb had probable cause to search Grimm's vehicle based upon Ace's alert to the presence of contraband.

The circuit court denied Grimm's motion to suppress the evidence discovered during the search of his vehicle. The court observed that there was no dispute that Sgt. Lamb had a reasonable basis to conduct a *Whren* stop of the vehicle because none of the occupants were wearing seatbelts. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). And, the court noted, there was no suggestion that the traffic stop was unreasonably extended for the purpose of conducting the dog scan. *Cf. Wilkes v. State*, 364 Md. 554, 583 (2001) (K-9 scan was conducted prior to officer's completion of tasks incident to the initial purpose of the traffic stop). The suppression court noted that "the State concedes[,] as I think it rightly should[,] that there is no probable cause absent the K-9 alert." And, the court added: "I will tell you that[,] absent the K-9 alert, if this had been litigated solely on those issues [*i.e.*, what the officers knew prior to the K-9 alert], I would not have found probable cause."

But the court concluded that, after Ace scanned the vehicle and gave an alert for the presence of narcotics, Sgt. Lamb had probable cause to search Grimm's vehicle. The court found that Ace and Officer Keightley were certified at the time of the stop and the scan. The court expressly found Sgt. Davis to be the most credible witness who testified in the case. The court elaborated: "I find her qualifications, her knowledge, her training and experience to be impeccable. . . . I find her to be the most credible witness and it is she who I rely upon the most and find to be the best and most objective observer." The court also

12

said: "I find her analysis of the stop and the dog's actions to be credible." The court further commented: "She explains, . . . to the satisfaction of the Court that I can find Officer Keightley and K-9 Ace to be credible and to be a certified dog that the Court can rely upon for assessing whether or not probable cause exists." The court therefore concluded that there was probable cause in this case for the officers to believe that there was a "fair probability" that one of the drugs that Ace was trained to detect would be found in the vehicle.

Pursuant to Maryland Rule 4-242(d)(2), Grimm entered a conditional plea of guilty to possession of heroin with intent to distribute; he was sentenced to a 15-year term of imprisonment. This direct appeal followed.

## DISCUSSION

### A. Standard of Review of Motions to Suppress Evidence

When we review a ruling from the circuit court concerning a motion to suppress evidence, "we must rely solely upon the record developed at the suppression hearing." *Briscoe v. State*, 422 Md. 384, 396 (2011). "We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion," which was the State in this case. *Id. Accord Robinson v. State*, 451 Md. 94, 108 (2017) ("'The appellate court views the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress.'" (Quoting *Varriale v. State*, 444 Md. 400, 410 (2015)); *Hailes v. State*, 442 Md. 488, 499 (2015) ("The appellate court views the trial court's findings of fact, the evidence, and the

13

inferences that may be drawn therefrom in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress." (Internal quotation marks, citations, and alteration marks omitted.)). As an appellate court, when we review the denial of a motion to dismiss, "[w]e review the findings of fact for clear error and do not engage in *de novo* fact-finding." *Haley v. State*, 398 Md. 106, 131 (2007) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). *Accord Robinson*, *supra*, 451 Md. at 108 ("'In reviewing a trial court's ruling on a motion to suppress, an appellate court reviews for clear error the trial court's findings of fact . . . .'" (Quoting *Varriale*, *supra*, 444 Md. at 410.)); *Raynor v. State*, 440 Md. 71, 81 (2014) ("We accept the suppression court's factual findings unless they are shown to be clearly erroneous."); *see also Ornelas*, *supra*, 517 U.S. at 699 ("[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.").

The Court of Appeals has made plain that "[f]indings of fact and credibility are to be made by trial courts, not appellate courts." *Longshore v. State*, 399 Md. 486, 520–21 (2007); *accord Barnes v. State*, 437 Md. 375, 398 (2014) ("The credibility of the witnesses and the weight to be given to the evidence fall within the province of the suppression court."). "'If there is any competent evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous.'" *Goff v. State*, 387 Md. 327, 338 (2005) (quoting *Solomon v. Solomon*, 383 Md. 176, 202 (2004)).

When reviewing the suppression court's interpretation of the applicable law, however, the appellate court "'reviews without deference the trial court's application of the

law to its findings of fact.'" *Robinson*, *supra*, 451 Md. at 108 (quoting *Varriale*, *supra*, 444 Md. at 410). We "'undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case.'" *Prioleau v. State*, 411 Md. 629, 638 (2009) (quoting *State v. Tolbert*, 381 Md. 539, 548 (2004)).

## B. Drug-Detection Dog Alerts

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. "'[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant.'" *Riley v. California*, ___ U.S. ___, 134 S.Ct. 2473, 2482 (2014) (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)).

But, in *Carroll v. United States*, 267 U.S. 132, 149 (1925), the Supreme Court of the United States recognized an "automobile exception" to the general requirement for a search warrant. The automobile exception, or *Carroll* doctrine, "allows vehicles to be searched without a warrant provided that the officer has probable cause to believe that a crime-connected item is within the car." *State v. Wallace*, 372 Md. 137, 146 (2002).

In *Florida v. Harris*, the Supreme Court further explained that "[a] police officer has probable cause to conduct a search when 'the facts available to [him] would "warrant a [person] of reasonable caution in the belief"' that contraband or evidence of a crime is present." 133 S.Ct. at 1055 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (alterations added in *Harris*)). The *Harris* Court observed: "All we have required is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'"

15

*Florida v. Harris*, *supra*, 133 S.Ct. at 1055 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 and 231 (1983); alteration added in *Harris*). In other words, probable cause requires only a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, *supra*, 462 U.S. at 238. *Accord Robinson*, *supra*, 451 Md. at 109–10. We look to the "totality of the circumstances" in any given situation in "evaluating whether the State has met this practical and common-sensical standard." *Florida v. Harris*, *supra*, 133 S.Ct. at 1055; *see also Johnson v. State*, ___ Md. ___, ___ No. 2465, September Term, 2015, slip op. at 2 (filed March 29, 2017) (suppression court erred by concluding that officers had probable cause to conduct a warrantless search of the *trunk* of a car under the *Carroll* Doctrine based solely on the discovery of drugs found in the waistband and on the breath of the front-seat passenger).

In *Florida v. Harris*, the Supreme Court noted that a drug-sniffing dog's alert, without more, suffices to establish probable cause for a search: "[A] well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found." 133 S.Ct. at 1056 n.2. Similarly, the Maryland Court of Appeals has held "that **when a properly trained canine alerts to a vehicle** indicating the likelihood of contraband, **sufficient probable cause exists to conduct a warrantless '*Carroll*' search of the vehicle**." *Wallace*, *supra*, 372 Md. at 146 (emphasis added). *Accord Wilkes*, *supra*, 364 Md. at 586–87 ("once a drug dog has alerted a trooper 'to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle],'" quoting *Gadson v. State*, 341 Md. 1, 8 (1995)); *Bowling v. State*, 227 Md. App. 460, 469, 476 (2016) ("the Maryland appellate courts

16

consistently have held that the detection of the odor of marijuana by a trained drug dog establishes probable cause to conduct a warrantless *Carroll* doctrine search of a vehicle," and the partial decriminalization of possession of small quantities of marijuana "does not change the established precedent that a drug dog's alert to the odor of marijuana, without more, provides the police with probable cause to authorize a search of a vehicle"); *Jackson v. State*, 190 Md. App. 497, 504 (2010) ("[A] trained drug-sniffing dog made a positive alert on the vehicle, thereby signaling the likely presence of narcotic drugs somewhere inside the vehicle. Once such a positive alert takes place, there is, *ipso facto*, probable cause for a *Carroll*–Doctrine search of the automobile." (Footnote omitted.)); *see also Robinson, supra*, 451 Md. at 118 n.7.

In *Florida v. Harris*, the Supreme Court emphasized that the prosecutor could establish the reliability of a drug-detection dog by presenting evidence of the dog's certification or training:

> **[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.**

133 S.Ct. at 1057 (emphasis added).

But the Supreme Court in *Florida v. Harris* further explained that, notwithstanding a dog's certification and training, a defendant must have the opportunity to contest the reliability of a drug-detection dog, noting:

17

A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant . . . . And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

*Id*. at 1057–58.

The *Harris* Court expressly rejected "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach" for a suppression court to apply when assessing whether a drug-detection dog was sufficiently reliable for its alert to be used in establishing probable cause to conduct a warrantless search. *Id*. at 1056. The Court observed that, as with any other probable cause analysis, "[a] gap as to any one matter . . . should not sink the State's case; rather, that 'deficiency . . . may be compensated for'" with additional evidence rebutting any deficiency. *Id*. at 1056 (quoting *Illinois v. Gates*, *supra*, 462 U.S. at 233).

In reversing the Supreme Court of Florida, the *Harris* Court criticized the Florida court for adopting an "inflexible set of evidentiary requirements" for that state's judges to utilize when assessing the reliability of a drug-detection dog for purposes of establishing probable cause:

To assess the reliability of a drug-detection dog, the [Florida Supreme C]ourt created a strict evidentiary checklist, whose every item the State must tick off. Most prominently, an alert cannot establish probable cause under the

18

Florida court's decision unless the State introduces comprehensive documentation of the dog's prior "hits" and "misses" in the field. (One wonders how the court would apply its test to a rookie dog.) No matter how much other proof the State offers of the dog's reliability, the absent field performance records will preclude a finding of probable cause. That is the antithesis of a totality-of-the-circumstances analysis.

*Id*.

The Supreme Court summarized the proper approach to be followed by the court hearing a motion to suppress a warrantless search for which the State claims probable cause was provided by an alert by a drug-detection dog:

> In short, **a probable-cause hearing focusing on a dog's alert should proceed much like any other**. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then **the court should weigh the competing evidence**. In all events, the court should not prescribe, as the Florida Supreme Court did [in *Harris v. State*, 71 So. 3d 756, 759 (Fla. 2011)], an inflexible set of evidentiary requirements. **The question**—similar to every inquiry into probable cause—**is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.** A sniff is up to snuff when it meets that test.

*Id*. at 1058 (emphasis added).

## C. Ace's Reliability

In Grimm's briefs in this Court, he urges us to review *de novo* the question of whether Ace was a "well-trained dog." He asserts: "Specifically, the question of whether Ace is well-trained or otherwise reliable for purposes of establishing probable cause is a mixed question of law and fact subject to *de novo* review." Citing *Ornelas, supra*, 517

19

U.S. at 696–98, Grimm argues that appellate courts are obligated to conduct *de novo* review of probable cause determinations. But he neglects to take sufficient notice of the point that, although the *Ornelas* Court held that, "as a general matter[,] determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal," *id*. at 699, the Court also emphasized, in the very next sentence, that findings of fact are reviewed for clear error, with deference to the trial-level court: "Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id*.

Grimm's request for us to conduct *de novo* review of the evidence presented regarding Ace's ability (or lack of ability) to detect drugs invites us to commit an error similar to the one that ensnared the Florida Supreme Court in *Harris v. State*, 71 So. 3d 756, 772–75 (2011), wherein that appellate court was highly critical of the quality and quantity of evidence the State of Florida had presented at the suppression hearing regarding the drug dog's successes and failures during training sessions and scans in the field. But, after the United States Supreme Court reversed and remanded that case, the Florida Supreme Court abandoned its list of evidentiary hurdles the prosecution was required to overcome, and summarily affirmed the suppression court's denial of Harris's motion to suppress. *Harris v. State*, 123 So. 3d 1144 (Fla. 2013) (per curiam).

Whether Ace was -- at the time of the scan of Grimm's vehicle -- a well-trained or reliable dog, whose alerts could be relied upon by Officer Keightley as indicating that there was a fair probability that the vehicle contained one of illegal drugs Ace had been trained

20

to detect, was a question of fact properly committed to the adjudicatory skill of the judge who heard the evidence presented at the hearing on the motion to suppress. An appellate court is ill-equipped to determine the proper amount of weight to be given to various pages of the extensive documentation in evidence regarding a dog's performance during training exercises, or to evaluate the credibility of witnesses, or weigh the conflicting testimony of experts. Such factual determinations are best left to the suppression court judge who hears the evidence, and are best reviewed under a "clearly erroneous" standard that gives deference to that judge's superior opportunity to evaluate credibility and weigh the evidence. *See Longshore*, *supra*, 399 Md. at 520–21 (stating that "[f]indings of fact and credibility are to be made by trial courts, not appellate courts"); *Haley*, *supra*, 398 Md. at 131 (explaining that appellate courts "do not engage in *de novo* fact-finding."). As an appellate court, we are obligated to "give deference to the first-level factual findings made by the suppression court, and we accept those findings unless shown to be clearly erroneous," *Briscoe*, *supra*, 422 Md. at 396, while giving "due regard to the [suppression] court's opportunity to assess the credibility of witnesses." *Gorman v. State*, 168 Md. App. 412, 421 (2006). As the Supreme Court stated in *Florida v. Harris*, "a probable-cause hearing focusing on a dog's alert should proceed much like any other. . . . [If] the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence." 133 S.Ct. at 1058. Clearly, the court that "should weigh the competing evidence" is the suppression court, not the appellate court reviewing a challenge to the suppression court's finding on the issue of the reliability of the dog.

Here, the circuit court evaluated all the evidence and expert testimony, and determined that Sgt. Mary Davis was the most credible of the experts who testified. Although the court, in the judicious exercise of courtroom courtesy, commented that the experts called by the defense were "both credible," the court also expressed concern that their testimony was colored by some "dissension in the ranks" regarding management at the Maryland Transportation Authority Police, and "some of this [testimony by Mr. Cox and Officer McNerney] was an airing of dirty laundry." The weighing of testimony and evaluation of which experts' opinions to credit are functions quintessentially best performed by the judge who hears the witnesses testify.

Although Grimm urges us to review *de novo* the question of whether Ace was a well-trained dog, he argues, in the alternative, that, even "if the lower court's findings bearing on whether Ace was well-trained or reliable are not themselves subject to *de novo* review, they are clearly erroneous . . . ." In support of this argument, Grimm points to several aspects of the suppression court's ruling with which he disagrees. He asserts that the court's conclusion that Sgt. Davis was "the most credible expert" was clearly erroneous because the court also commented: "I find her to be a witness who has no ties to the case, neutral and unbiased and has – I find that she has no issue with the handler or the dog." Grimm asserts that, because Sgt. Davis had performed a recertification of Ace in August 2014, "her [own] professional reputation was also challenged" and she "had a direct investment in the outcome of this suppression hearing—her reputation." This argument addresses the suppression court's weighing of the evidence, and does not support a claim that the court made a clearly erroneous finding of material fact.

22

In *United States v. Ludwig*, 641 F.3d 1243 (10th Cir. 2011), the suppression court had resolved in favor of the prosecution conflicting testimony of dog experts. The appellate court found no clear error, and explained:

> [A]t the end of this battle of the experts, the district court chose to credit [the government's expert] rather than [the defendant's] expert. On appeal, we may not revisit the site of this battle, recreate it in our imaginations, and resolve it for ourselves anew. Neither is it enough for [the defendant] to ask us (as he does) simply to credit his expert's conclusions rather than the government's. Instead, it is incumbent on [the defendant] to show that the district court's resolution of the experts' credibility contest was not just wrong but clearly or pellucidly (and so reversibly) wrong. And this he has not done.

*Id*. at 1253.

So, too, in this case, the suppression court chose to credit the testimony of the State's expert rather than the defendant's experts. We detect no clear error in the suppression court's decision to accept the expert opinions offered by Sgt. Davis regarding the reliability of Ace, the adequacy of his training, and the validity of his alert to Grimm's vehicle.

Grimm also urges us to conclude that the court's finding that Ace was a reliable dog was clearly erroneous in the face of evidence of training deficiencies. Grimm states: "Perhaps the most obvious flaw in Ace's training is the fact that Keightley [personally] placed Ace's training aids, with cuing being the result." A double-blind training regimen would have been preferable, according to the Scientific Working Group on Dog and Orthogonal Detector Guidelines. Further, according to Grimm, Ace's training records did not reflect adequate training efforts to address the dog's "false alerts." Mr. Cox opined that too little effort was documented to satisfy him that Officer Keightley had conducted training exercises sufficient to "extinct" Ace from alerting to non-target odors. And,

23

according to Grimm, Sgt. Davis's testimony as to why she was not overly concerned about Ace's false alerts was not supported by the training records.

Grimm further urges us to conclude that the suppression court was clearly erroneous in finding Ace to be reliable because there was evidence presented at the suppression hearing to show that the drug samples used as training aids had become contaminated with impurities, which may have led to Ace responding to odors other than the five target narcotics. In addition, Grimm contends that the training conducted by Officer Keightley had "inadequate trainer supervision," which was a problem for all of the dog handlers at the Maryland Transportation Authority Police due to inadequate staffing—part of the "dirty laundry" to which the suppression court made reference. Grimm states in his brief: "McNerney eventually resigned over the dysfunction surrounding the training of Ace and other MTA K-9s."

As noted above, Officer McNerney decertified Ace and Officer Keightley in May 2014 because of the manner in which the handlers logged training time. But Officer McNerney also recertified Ace and Officer Keightley just two days after decertifying them, and presumably, they could not have completed much compensatory training during those two days. Sgt. Davis said she would not have "decertified" Ace and Officer Keightley, and she saw no issue with the manner in which Officer Keightley had been logging training hours; she said that, in her experience, she had seen handlers typically record training hours in the same manner as Officer Keightley.

Grimm nevertheless argues that the fact that Ace was decertified in May 2014 proved that "Ace was not actually certified in any meaningful sense at the time of the scan"

24

of his vehicle. He makes this argument in spite of the fact that his expert witness was the trainer who conducted Ace's recertification in January 2014 and testified that certifications are valid for six months.

Grimm asserts that Mr. Cox's analysis of the dash-cam video recording of the scan should have been accepted by the suppression court as proof that Ace did not actually alert to an odor of narcotics. But Sgt. Davis presented a different analysis, putting a stamp of approval on the scan and the alert; and the suppression court found her to be the more credible witness.

Grimm also urges us to focus on Mr. Cox's testimony regarding his analysis of Ace's training records that showed 44 "false alerts" in 179 training scenarios. Mr. Cox considered that unacceptable. But, in contrast to Mr. Cox's analysis, Sgt. Davis had analyzed a different period of time and found a much lower rate of false alerts during training scenarios. And she testified that there was no particular amount of false alerts that she would find unacceptable. Instead, she said, "I would always be wondering why they are occurring. . . . And I would make a plan to address them if I thought they were problematic."

After pointing out evidence that was favorable to the defense, Grimm argues, "there was overwhelming evidence that Ace was not well-trained and not reliable when he scanned Appellant's vehicle." Grimm urges us to conclude: "Even under a clearly erroneous standard, when this Court reviews the 'entire evidence' on its own it will be 'left with the definite and firm conviction that a mistake has been committed,' i.e., that Ace was neither well-trained, nor reliable. *Kusi* [*v. State*], 438 Md. [362,] 383 [(2014)]."

25

The State takes issue with most of Grimm's characterizations of the evidence, and devotes a portion of its brief to a countering review of Ace's training records. The State asserts that the records from 2012 through July 2014 reflect that "Ace was tested 679 times in his training history," and it appears that, during those tests, "Ace gave false positive alerts 16 times. . . . That equates to a mere 2 percent false-positive rate." And, the State argues, "Ace failed to alert to the presence of drugs 32 times, . . . which equates to a false-negative rate of 4.7 percent." Grimm disagrees with the State's analysis of how well Ace performed during his training classes.

But, because our standard of appellate review requires us to view "the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the [prevailing] party," *Robinson, supra*, 451 Md. at 108, we need not respond to each item of evidence that Grimm highlights. It is sufficient for us to say that there was competent evidence in the record that, when viewed in the light most favorable to the prevailing party, supported the suppression court's finding that Ace was a sufficiently well-trained drug-sniffing dog that it was appropriate for Officer Keightley and Sgt. Lamb to rely on Ace's alert as an indication that there was a fair probability they would find narcotics in Grimm's vehicle.

**D. Admission of Ace's Post-Scan Certification**

Grimm's final argument as to why we should reverse the ruling of the suppression court is based upon the admission of evidence regarding the recertification of Ace four months after the scan of his vehicle. Grimm asserts: "Whether Ace passes a certification four months after the scan of Appellant's vehicle is not relevant to an assessment of his

26

reliability on the day of the scan . . . ." Grimm argues that the court committed reversible error in admitting irrelevant evidence.

The issue arose during the direct examination of Sgt. Davis, who testified that she and other officers from the Montgomery County Police had participated in an evaluation and certification of the Maryland Transportation Authority Police's canine unit during August 2014 (*i.e*., approximately four months after the scan of Grimm's vehicle). When the prosecutor offered documents relative to the August visit, defense counsel objected, and the following colloquy transpired:

> [Counsel for Grimm]: Objection.
>
> THE COURT:  Grounds?
>
> [Counsel for Grimm]: Relevance, Your Honor. These documents are all from August of 2014. The incident in question here happened on April 19th, 2014. So this is months after the fact. So it's just a question of relevance.
>
> THE COURT: I understand that, but it still relates to the overall training of the dog . . . .  I'm going to overrule. I think it's relevant. I mean, I think that the field performance and the training that they do after can be just as important as before. It confirms whether or not the dog still can do what the dog was trained to do or the dog can't do what the dog was trained to do. So I think it can come in a couple different ways.
>
> [Counsel for Grimm]: Oh, I understand, Your Honor –
>
> THE COURT: I don't know how much weight I'm going to give it . . . but in terms of admissibility I think it's admissible for a couple of reasons.

We review a question of whether evidence is legally relevant for legal error. *State v. Simms*, 420 Md. 705, 725 (2011); *Parker v. State*, 408 Md. 428, 437 (2009).

Maryland Rule 5-401 defines "relevant evidence" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, a primary issue for the suppression court to decide was whether Ace was a well-trained, reliable dog on the date of the scan of Grimm's vehicle. There was no dispute in the testimony that Ace had been certified by the Maryland Transportation Authority Police, and had been recertified many times, to be well-trained in the detection of heroin and other narcotics. Yet, although Ace had been recertified in January 2014, Grimm was arguing at the suppression hearing that Ace was no longer reliable in April 2014. Grimm's attack upon Ace's reliability—despite the fact that his own expert had previously certified him as reliable—was tantamount to arguing that Ace had somehow lost his ability to reliably detect the odor of narcotics. Although, as the suppression court noted, the recertification in August 2014 might be of limited weight in establishing whether Ace had lost the ability to detect narcotics as of April 19, 2014, it was evidence that had some tendency to make it improbable that Ace had suffered a loss of his olfactory sense, and consequently, this evidence would rule out one potential argument or possible explanation as to why Ace might have been less reliable on April 19, 2014, than he had been in January 2014. The evidence was, therefore, not irrelevant as a matter of law, and the suppression court did not err in admitting the evidence.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**