*Raphael Battle v. State of Maryland*, No. 1654, Sept. Term 2019, and No. 485, Sept. Term 2020. Opinion by Arthur, J.

## CRIMINAL LAW—SUPREMACY CLAUSE IMMUNITY

A federal agent has Supremacy Clause Immunity from state prosecution for conduct that violates a state's criminal law if (1) the federal agent was performing an act that the agent was authorized to perform by the laws of the United States and (2) in performing that authorized act, the agent did no more than what was necessary and proper. A federal agent's actions were necessary and proper if the agent subjectively believed that the actions were authorized by federal law and if that belief is objectively reasonable. In this case, the court was not clearly erroneous in concluding that the federal agent did not qualify for immunity from state charges of assault and related offenses. The federal agent was not authorized to make a warrantless arrest under federal statutes. The victim of the federal agent's assaultive conduct committed no crime that would justify his arrest. The court did not err in determining that the agent's actions were motivated by malice and a personal motive to stick up for himself instead of by a desire to perform his government duties. The federal agent's actions were not necessary and proper because neither his subjective belief that he was in imminent danger nor his subsequent actions were objectively reasonable.

## EVIDENCE—INADMISSIBLE HEARSAY

Hearsay is an out of court statement offered to prove the truth of the matter asserted. Hearsay, even if relevant, is inadmissible if not covered by a recognized exception. Counsel's questioning during trial cannot "open the door" to the admissibility of hearsay statements. A victim's statements concerning his account of events made during an interview with a police officer captured via a body-worn camera were inadmissible hearsay. They were offered for their truth and were relied on substantively by the State and the court.

## CRIMINAL LAW—RIGHT TO CONFRONTATION

A witness's out-of-court statements are testimonial, for purposes of the Confrontation Clause, when the circumstances objectively indicate that there is no ongoing emergency and that the primary purpose of the interrogation is to establish facts potentially relevant to later criminal prosecution. An alleged victim's statements given to the police and recorded via a body-worn camera after the ongoing emergency was over are testimonial. Defendant's constitutional right to confront adverse witnesses is violated when the court allows the State to play footage containing testimonial statements from a non-testifying witness.

Circuit Court for Baltimore City
Case No. 118193012

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

CONSOLIDATED

No. 1654, September Term, 2019
No. 485, September Term, 2020

_____

RAPHAEL BATTLE

v.

STATE OF MARYLAND

_____

Kehoe,
Arthur,
Wells,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: September 3, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Raphael Battle, a federal law enforcement officer, was charged with first-degree assault, reckless endangerment, and use of a handgun in the commission of a crime of violence. A Baltimore City jury acquitted him of first-degree assault, but was unable to reach a verdict on the other charges, including the lesser-included offense of second-degree assault.

At a second trial, the jury convicted Battle of second-degree assault, reckless endangerment, and use of a handgun in the commission of a crime of violence. The circuit court sentenced Battle to five years' incarceration without the possibility for parole.

Battle noted an appeal. That appeal is No. 1654 of the September 2019 Term.

While his appeal was pending, Battle moved to vacate the jury verdict on the ground of jurisdictional mistake under former Md. Rule 4-331(b)(1)(B).[1] The court denied the motion, and Battle noted a second appeal. That appeal is No. 0485 of the September 2020 Term.

We consolidated the two appeals. For the reasons stated herein, we conclude that the court did not err in denying the motion to vacate the jury verdict, but that it erred in admitting inadmissible hearsay at Battle's second trial. Therefore, we reverse the convictions and remand for a new trial.

---

[1] Maryland Rule 4-331 was revised effective July 1, 2021. The language of former Rule 4-331(b)(1)(B) is now found at Rule 4-331(b)(2). Citations in this opinion refer to the version in effect at the time of the circuit court proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

This case arises from an incident that occurred in the early morning hours at a convenience store in Baltimore City. Battle and another man, Devin King, had an altercation. Battle, claiming that he felt threatened, drew his service weapon and pushed King to the ground. Employees of the store called the police, who arrested Battle after they had interviewed both Battle and King.

### A. Convenience Store Video Footage

At trial, the State submitted video evidence depicting the incident. There was no audio on either video.

A video from the interior of the store shows Devin King walking up and down the aisles and picking up groceries from the shelves at approximately 1:30 a.m. Moments later, Battle enters the store. At that point, a small crowd of customers is waiting around the cash register and the front counter, obstructing Battle's path.

Among the crowd is King, who is facing away from the check-out counter and looking at the items on display at the end of an aisle. Battle walks past him, towards an ATM. As Battle passes by the crowd of people obstructing his path, he turns his body, attempts to slide through, and appears to brush against King's back.

King immediately turns to Battle and says something to him as Battle continues to walk to the ATM. The two begin exchanging words, King standing near the front of the store and Battle in the far corner. As they continue arguing, Battle briefly moves behind the counter to get closer to King, but then moves back to the far corner of the store. King pays for his items and leaves the store. Battle exits the store immediately afterwards.

The video of the store's parking lot depicts King exiting the store and walking to the right, towards the road. Battle leaves the store and goes straight, in the direction of his car, which is parked at a gas pump. Battle walks to the front of his car and looks in King's direction. On the video, King is hardly visible, in the darkness beyond the parking lot of the convenience store.

Standing about 30 feet apart, the two are still exchanging words. Battle removes his gun from his holster, places it at his side, and walks briskly towards King, passing his car and a gas pump to reach him. King walks several feet closer to Battle until the two are only a few feet apart. King is holding a plastic bag with groceries from the store in each hand.

Battle places his hand on King's shoulder and pushes him to the ground, causing King to drop his bags. While King is on the ground, Battle raises his gun from his side and points it at King. King stands up, says something to Battle, and scampers backward as Battle continues to point the gun at him. At the end of the video, several store employees emerge from the store to investigate.

### B. Battle's Testimony

Battle was a plainclothes law enforcement officer with the United States Department of Homeland Security. As such, he was authorized to carry a handgun.

Battle testified that, on the evening when the alleged assault occurred, he was on his way to his office in Baltimore, where he was going to pick up a transponder to send information that had been gathered during his investigations. He stopped at the convenience store because he needed gas.

3

Battle said that, when he attempted to get past King in the convenience store, he "said, 'Excuse me' to the gentleman a couple times." After the pair made the initial contact, King allegedly turned and said, "Why the fuck are you bumping into me?" Battle claimed that he "[did not] want to get into a confrontation with [King]."

According to Battle, King yelled, "Man, I should fuck you up" while the two were in the store. Battle said that he generally kept his distance from King, but that he "pretty much was standing up for [him]self, telling [King], like, 'No, man, I'm not going to let you do that. Just go and get your stuff, go on about your business.'"

Battle testified that King exited the store and walked to the right. Battle exited the store as well, and headed straight towards his car. There was "no conversation at that point." Battle claimed that, while walking away, King yelled across the lot, "I hope you don't think this is over, motherfucker," "Oh, I got something for you," "You ain't going to make it out of here tonight," and "I'm going to bust your fucking head."

Battle testified that, while King was yelling, he (Battle) had approached the rear of his car to take the gas pump out. At that point, Battle said that he "felt as though [King] was going to try something, and [he] didn't want to be in a vulnerable predicament[] being behind the gas pump."

Because of King's verbal threats, Battle said that he "believed [King] was going to harm [him]." In accordance with what he described as his federal training, Battle produced his weapon to establish "officer presence." Battle walked towards King, identified himself as a law enforcement officer, and asked King to show him his hands.

4

Battle testified that, as he made his approach, King tugged at his shirt, suggesting to Battle that King might have a gun. Because of the perceived threats and the possibility King was armed, Battle said that he considered his interaction with King "an emergency situation." Battle claimed to "believe[] that Mr. King posed a threat."

After Battle's approach, King closed the remaining space of about 10 to 12 feet between them. Battle testified:

> At that point, I'm taught to create space, and this is why you see me push him away. I push him away because he makes a . . . quick kind of, like, lunge at me. When he makes that lunge I push back to create that space from him.

Battle, who claimed to be acting in his accordance with his training and status as a federal law enforcement officer, testified that he had no intention of arresting King at any point before the "lunge." He believed that he did not have the right to arrest King until that point.

### C. *Objection to Bodycam Footage*

On the second day of trial, the State questioned the arresting officer, Sergeant Degele. The sergeant testified that, upon arriving at the scene on the night of the incident, he had interviewed both Battle and King. The footage of the interviews was captured via Sgt. Degele's body-worn camera.

The State requested permission to play just the portion of the footage that showed the discussion between Sgt. Degele and Battle. The prosecutor recognized that the remainder of the footage, containing the officer's conversation with King, was objectionable, presumably because it included King's hearsay account of his encounter

5

with Battle.  Accordingly, the prosecutor informed the court that King's interview was "not going to be played."  The State played the bodycam footage featuring Sgt. Degele's interview with Battle.

On cross-examination, counsel for Battle asked Sgt. Degele if he had asked King to take a drug test.  Sgt. Degele responded that he had not.

At a bench conference during the re-direct examination of Sgt. Degele, the State argued that Battle had "opened the door" to the admission of the footage of King's conversation with Sgt. Degele.  The State argued that the jury should be allowed to form its own opinion about King after defense counsel's insinuation that King was on drugs.  The court agreed and, over Battle's objection, permitted the State to play the recording showing King's recollection of the incident.  The State then played the footage of Sgt. Degele's interview with King:

> [SGT. DEGELE]:  All right.  What happened?
>
> [KING]:  I'm in the store.  Like, I just came from home.  Well, I came in the store.  I walked around, getting my little groceries, whatever, you feel me.  I'm standing right here getting a Slim Jim.
>
> It's like how he said it, but he's seeing me grabbing a Slim Jim.  He's just being aggressive for nothing.  Even on the camera, you can see.  I'm being aggressive, but not --
>
> [SGT. DEGELE]: What did he say to you?
>
> [KING]:  He said, "Move out the way.  You seen me."  I said, "What you doing all that for, sir?  Like, what are you doing that for?  Like, you see me grabbing a Slim Jim.  I'm getting out of everybody's way."  I said -- I even told the other people, "Excuse me."  You feel me?  He's being aggressive for nothing.  For nothing, like.  I said, "What you doing all this for?  You ain't got to do all that.  I'm going to get out of your way, you feel me."  Like, I didn't even want to walk then.  And I come out the store, when I got to walk this way, you feel me -- like,

6

I'm new around here. So I don't know, like, which way to go for real, so I come back and go because I came from this way. So I'm, like, fuck it, I'm just going to go back the way I came.

[SGT. DEGELE]: "Did you walk here?"

[KING]: Yeah, I walked down here. I walked down here so I'm, like, I'm going to go back the same way I went. So when I got out, he was so aggressive. So I said, "Man, listen, man I'm not with all that." I said, "You want to fight, we can fight. I'm not going to lie to you." I said, "You want to fight? We'll fight." I ain't got no weapon, no nothing.

So when I get -- I walk toward -- with the way I came, he whipped the gun out and -- before he pulled the gun out, he pushed me. He put his hands on me and all that.

Like, I want to press charges on him. Like he really -- I got bruises on my hand. I never came towards this man, never swung on him, nothing. He pushed me, all that shit.

Then when I come towards him -- so you feeling me; right? When I come towards him, he straight whipped a gun out on me. Like, what you doing all that for?

The State did not call King to testify at trial, presumably because it had been unable to locate him. King apparently did not testify at Battle's first trial either, because the State did not ask to read his testimony under Md. Rule 5-804(b)(1), the hearsay exception that permits the introduction of the former testimony of an unavailable witness whom the opposing party had an opportunity to cross-examine.

After the State rested, Battle moved for judgment of acquittal. Battle argued that the State had failed to prove necessary elements of each of the three charges and that the State has not shown that Battle's actions were not justified.

In denying the motion, the court cited the video footage showing King's account of the encounter given to Sgt. Degele as a basis for its conclusion that Battle had committed an offensive physical contact constituting second-degree assault.

During its rebuttal closing argument, counsel for the State addressed Battle's point that King, the alleged victim, did not appear. That State stated, "It's unfortunate he's not here. You heard what he had to say. You heard exactly what he had to say on the stand there. He's not here. He's not here."

### D. Jury Verdict and Sentence

At the conclusion of trial, the jury returned a verdict of guilty on all three counts against Battle – second-degree assault, reckless endangerment, and use of a handgun in the commission of a crime of violence.

Battle was sentenced to five years' incarceration, without the possibility for parole, for the use of a handgun in the commission of a crime of violence. He was sentenced to four years' incarceration for second-degree assault. The four-year sentence for second-degree assault runs concurrently with the five-year sentence for use of a handgun in the commission of a crime of violence. The reckless endangerment conviction merged with the assault conviction for purposes of sentencing.

Battle appealed. That appeal is case No. 1654, September Term 2019.

### E. Motion to Vacate the Jury Verdict

About six weeks after his sentencing, Battle moved to vacate the jury verdict on the basis of jurisdictional mistake under Maryland Rule 4-331(b)(1)(b). In his motion, Battle contended that the circuit court lacked subject-matter jurisdiction over his case

8

because, as a federal officer, he was immune from state prosecution. He invoked the doctrine of Supremacy Clause immunity, under which a state cannot prosecute federal officers who were authorized by federal law to perform an act and who did no more than they subjectively believed was necessary and proper, as long the belief was reasonable under the circumstances. *See*, *e.g.*, *State of Texas v. Kleinert*, 855 F.3d 305, 314-15 (5th Cir. 2017).

Battle argued that he was acting in his official capacity as a federal agent when he stopped to get gas at the convenience store while he was on his way to his office to retrieve a transponder. Because of King's alleged threats, he claimed to have subjectively believed that it was necessary and proper for him to draw his gun, approach King, and push him, and that he was therefore immune from state prosecution.

The court denied the motion to vacate the jury verdict for two reasons. First, the court found that Battle was not performing his governmental duty, but was acting out of a personal motive and malice when he assaulted King. Second, the court found that Battle's alleged belief that he was in danger was not objectively reasonable. Therefore, the court determined that Battle was not entitled to Supremacy Clause immunity.

On May 4, 2020, Battle noted a timely appeal from the denial of his motion to vacate. That appeal is case No. 0485, September Term 2020.

On September 11, 2020, we granted Battle's motion to consolidate the appeals.

Additional facts will be provided in the analysis where necessary.

## QUESTION PRESENTED

Battle presents two questions for our review, which we have reworded:

9

1. Did the circuit court err in denying Battle's motion to vacate the jury verdict for lack of subject matter jurisdiction in deciding appellant did not have Supremacy Clause immunity?

2. Did the circuit court err in admitting the alleged victim's statements over Battle's hearsay and Confrontation Clause objections?[2]

## DISCUSSION

There are two primary issues in this appeal.  First, we will address Battle's Supremacy Clause immunity argument.

## I.

After trial, Battle moved to vacate the jury's verdict on the ground of jurisdictional mistake under Maryland Rule 4-331(b)(1)(B).  Battle argues that the circuit court erred in denying his motion because he had Supremacy Clause immunity, divesting the state court of the power to prosecute and sentence him.  We disagree.

### A.  Standard of Review

Maryland appellate courts "review a circuit court's determination of whether there was fraud, mistake, or irregularity for clear error and legal correctness."  *Davis v.*

---

[2] Battle formulated the questions presented as follows:

1. Does Supremacy Clause immunity preclude Maryland Courts from exercising subject-matter jurisdiction over the prosecution of Appellant, a federal law enforcement officer acting within the scope of his authority and doing no more than what was necessary and proper under the circumstances?

2. Did the lower court err when it admitted, through an officer's body-worn camera footage, the testimonial hearsay statements of a non-testifying witness, in violation of the rule against hearsay and the Confrontation Clause?

*Attorney Gen.*, 187 Md. App. 110, 124 (2009). "Supremacy Clause immunity dismissals present a mixed question of law and fact[.]" *Wyoming v. Livingston*, 443 F.3d 1211, 1226 (10th Cir. 2006). "'[A]n appellate court reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's application of the law to its findings of fact.'" *Varriale v. State*, 444 Md. 400, 410 (2015) (quoting *Hailes v. State*, 442 Md. 488, 499 (2015)).[3]

### B. Maryland Rule 4-331(b)(1)(B)

At the time of Battle's trial and his post-judgment revisory motion, Maryland Rule 4-331(b)(1)(B) stated:

(b) Revisory Power.

(1) Generally. The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:

\*　　\*　　\*

(A) in the circuit courts, on motion filed within 90 days after its imposition of sentence. Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.

---

[3] Supremacy Clause immunity cases are almost invariably decided in a federal court under procedural circumstances quite different from those of this case. Typically, Supremacy Clause immunity cases arise when a state charges a federal official with a crime under state law, and the official moves to remove the case to federal court under 28 U.S.C. § 1442(a). *See*, *e.g.*, *Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006); *Commonwealth of Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988). In those circumstances, the federal court evaluates the allegations against the federal officer and decides whether the officer has Supremacy Clause immunity. Neither party cites any case in which a state court was required to decide the question of Supremacy Clause immunity after a trial on the merits when the officer has failed to raise the issue of immunity until after he had been convicted. Nor are we aware of any such case.

"Mistake" is construed narrowly and "limited to a jurisdictional error, i.e., where the court has no power to enter judgment." *Minger v. State*, 157 Md. App. 157, 171 (2004) (quoting *Tandra S. v. Tyrone W.*, 336 Md. 303, 317 (1994)). [4] When a federal agent is acting with Supremacy Clause immunity, the state court is said to lack jurisdiction to prosecute the agent "for conduct facially violative of the state's criminal code." *Commonwealth of Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988); *see also Wyoming v. Livingston*, 443 F.3d at 1220.

Here, the question is whether Battle qualified for Supremacy Clause immunity when he performed the actions that led to his convictions in state court. If he lacked immunity, the court acted properly in not vacating the verdict for lack of jurisdiction.

## C. Supremacy Clause Immunity

The Supremacy Clause of the United States Constitution states:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI, cl. 2.

Although Article VI refers only to the "Constitution" and "Laws," "its implication is that states may not impede or interfere with the actions of federal executive officials

---

[4] *Minger v. State*, 157 Md. App. 157, 171 (2004), recognized that there were numerous cases interpreting "fraud, mistake, or irregularity" as the terms appear in Md. Rule 2-535(b), but none interpreting those terms as they appear in Md. Rule 4-331(b). Accordingly, this Court stated, "although neither we nor the Court of Appeals have heretofore ever explicitly held that the words 'fraud, mistake or irregularity' mean the same thing in Rule 4-331(b) as in Rule 2-535(b), we now hold that they do." *Id.* at 172.

12

when they are carrying out federal laws." *Wyoming v. Livingston*, 443 F.3d at 1217.

This principle was established by Chief Justice John Marshall in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819), which held that "the states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government."

The leading Supreme Court case on Supremacy Clause immunity is *In re Neagle*, 135 U.S. 1 (1890). In *Neagle*, 135 U.S. at 4, Neagle, a United States Marshal, shot and killed the would-be assassin of Justice Field as the Justice made his rounds as a Ninth Circuit judge. The Marshal was charged with murder in a California state court. On a writ of habeas corpus, a federal district court ordered his release, on the ground that "Neagle was held in custody for an act done in pursuance of a law of the United States, and that he was imprisoned in violation of the Constitution and laws of the United States." *Commonwealth of Kentucky v. Long*, 837 F.2d at 743. The Supreme Court affirmed. *In re Neagle*, 135 U.S. at 69-71.

The *Neagle* Court established a two-part test to determine whether a state court is divested of the power to prosecute a federal agent for a state crime:

> [A] state court has no jurisdiction if (1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do.

*Commonwealth of Kentucky v. Long*, 837 F.2d at 744 (citing *In re Neagle*, 135 U.S. at 75).

13

When assessing whether a federal officer's actions were "necessary and proper," the court must apply both a subjective and objective standard. *Id.* at 745. The court must determine whether the federal officer subjectively believed that the actions were authorized. Then, the court must analyze whether the federal officer's subjective belief was objectively reasonable under the circumstances. *Commonwealth of Kentucky v. Long*, 837 F.2d at 744.

### D. Express Authority under Federal Law

The first prong of the *Neagle* test requires the federal agent to have authority to act, either expressly or impliedly, under the laws of the United States. *See Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977).

Federal law authorizes federal officers to make warrantless arrests "for any offense against the United States, if the offense is committed in the officer's . . . presence." 8 U.S.C. § 1357(a)(5)(A). Battle argues that he had the authority to make a warrantless arrest of King because King had violated two federal statutes: 18 U.S.C. § 111(a)(1), which criminalizes an assault of a federal officer, and 18 U.S.C. § 115(a)(1)(B), which criminalizes threats against a federal officer with the intention of impeding the officer's duties. Battle argues that he acted with express federal authority when he engaged King because he was performing official government duties and King's actions constituted a federal crime under either statute.

At a hearing for the motion to vacate the jury verdict, Battle testified that he was "on duty" and was performing official government work during his encounter with King: he was traveling from one job site to another when he needed to stop to get gas.

14

Although the circuit court did not make an explicit finding as to whether Battle was "on duty" at the time of the incident,[5] we assume that Battle was "on duty." Notwithstanding that assumption, King had not committed either of the alleged federal crimes that Battle cites.

Battle testified to the following chronological series of events. Inside of the convenience store, after their initial encounter, King allegedly told Battle, "Man, I should fuck you up." After a few more exchanges of banter, both men left the store. While walking away from Battle, King allegedly said, "I hope you don't think this is over, motherfucker," "Oh, I got something for you," and "You ain't going to make it out of here tonight." When King was approximately 30 feet away and barely visible on the video footage, he allegedly said, "I'm going to bust your fucking head."

After King allegedly made that statement, Battle drew his weapon, identified himself as a law enforcement officer, and approached King. After Battle identified himself, King allegedly stated, "I don't give a fuck who you are." Battle claims that King then "lunge[d]" at him and that Battle shoved him to the ground. While he was still on the ground, King allegedly said, "I want to fight your ass."

### 1. **18 U.S.C. § 111(a)(1)**

The first federal statute that Battle contends that King violated is 18 U.S.C. § 111(a)(1), which states:

_____

[5] During cross-examination Battle was presented with various hypothetical questions to determine just how far being "on duty" extends. The court allowed the discussion, but stated, "We are going far afield." At the conclusion of cross-examination, the court asked Battle, "Are you ever off duty?" Battle responded, "Not really, sir."

Whoever . . . forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . . shall . . . be fined under this title or imprisoned.

The persons designated in § 1114 of Title 18 include "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)." Battle is such a person.

As the State correctly asserts, § 111(a)(1) applies only if an assault or other wrongful conduct was done "forcibly." "[T]hat element may be satisfied by proof of actual physical contact, or by proof of 'such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.'" *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir. 1993) (quoting *United States v. Walker*, 835 F.2d 983, 987 (2d Cir. 1987)).

"[T]he concept of the use of force contemplates and requires more than a person merely verbalizing or implying threats involving the future use of force." *United States v. Fernandez*, 837 F.2d 1031, 1035 (11th Cir. 1988) (quotation marks omitted). "Forcible assault has been defined as 'any willful threat or attempt to inflict bodily injury upon the person of another *when coupled with an apparent present ability to do so*, and includes any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm.'" *United States v. Fallen*, 256 F.3d 1082, 1087 (11th Cir. 2001) (quoting *United States v. Renfro*, 620 F.2d 497, 500 (5th Cir. 1980)) (emphasis added); *see also United States v. Temple*, 447 F.3d 130, 139 (2d Cir. 2006).

16

Because King did not make actual physical contact with Battle, King's statements and accompanying actions would need to constitute a forcible assault in order to implicate § 111(a)(1). In other words, the actions accompanying King's statements would need to constitute a threat or display of physical aggression, coupled with an apparent present ability to carry out the threat, that would inspire fear of pain, bodily harm, or death, before King could be said to have violated § 111(a)(1). *United States v. Walker*, 835 F.2d at 987; *United States v. Renfro*, 620 F.2d at 500.

King's first statement to Battle, "Man, I should fuck you up," was allegedly made in the convenience store, when King was standing at the checkout counter with his purchases, some 10 to 15 feet away from Battle. The next three statements, "I hope you don't think this is over, motherfucker," "Oh, I got something for you," and "You ain't going to make it out of here tonight," were allegedly made while King was walking away from Battle and leaving the convenience store parking lot with a grocery bag in each hand. King's next statement, "I'm going to bust your fucking head," was allegedly made after King, bags still in hand, had left the parking lot and was walking along the street, almost completely out of view on the surveillance footage. Evidently, this was the statement that made Battle decide to close the distance between them.

None of these statements, as a matter of law, could be a basis for an assault, because King did not have the present ability to effectuate his threats. *United States v. Renfro*, 620 F.2d at 500. When King allegedly made the first of these statements, he was standing near a checkout counter, with his purchases, 10 feet or more from Battle. The court found that, when the next three statements were allegedly made, Battle and King

17

were moving in opposite directions and were up to as much as 27 to 30 feet apart. The court also found that King was carrying grocery bags in each hand and appeared to be leaving the store's parking lot. Thus, the court found it was not objectively reasonable for Battle to feel that he was in any imminent danger from King's threats. This finding is not clearly erroneous.

Battle's testimony supports this conclusion. He conceded that when he was approaching King after King allegedly said that he "was going to bust [Battle's] fucking head," he had no intention of arresting King or did not believe that he had the right to arrest him. According to Battle's own account, he apparently did not believe that any of King's statements or conduct at that point constituted a forcible assault that would be a crime under § 111(a)(1) for which he could make an arrest.

King's next statement, "I don't give a fuck who you are," allegedly made in response to Battle's announcement that he was a law enforcement officer, could not form the basis for a forcible assault against a federal agent. Before King allegedly made that statement, Battle had already drawn his gun and begun to close the distance between himself and King.

It was not until what Battle described as King's "lunge" toward him that Battle intended to arrest King for committing a crime. At about the same time, King allegedly tugged on his shirt, which, Battle said, indicated that he may have been armed. According to Battle, King's statements, in concert with those actions, were sufficient displays of physical aggression to implicate § 111(a)(1).

18

Based on the video evidence, however, the court found that King did not lunge at Battle. Likewise, the circuit court found no evidence that King had a weapon. In fact, at the time of the alleged lunge, King had a plastic bag of groceries in each hand. Those findings are not clearly erroneous.

King's final statement, "I want to fight your ass," was made after Battle had shoved him to the ground. It cannot justify actions that Battle took before the statement was made.

In short, the record discloses no basis to conclude that King forcibly assaulted Battle in violation of 18 U.S.C. § 111(a)(1). Moreover, any such conclusion is precluded by several of the court's factual findings, which are not clearly erroneous. For purposes of Supremacy Clause immunity, therefore, Battle did not have authority to act as he did under § 111(a)(1).

## 2. **18 U.S.C. § 115(a)(1)(B)**

The second federal statute that Battle alleges King violated is 18 U.S.C. § 115(a)(1)(B), which states:

> Whoever . . . threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under [section 1114 of this title] . . . with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished as provided in subsection (b).

In contrast to § 111(a)(1), § 115(a)(1)(B) does not require a "forcible" assault. *See United States v. Orozco-Santillan*, 903 F.2d 1263, 1266 (9th Cir. 1990), *overruled in part*

19

*on other grounds by Planned Parenthood of the Columbia/Willamette, Inc. v. American*

*Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) (defendant's threats to kick a

federal agent's "fucking ass" and box with him were threats to assault under §

115(a)(1)(B)).

> However, the statute contains an additional specific intent element:

> [T]he additional, specific intent requirement in 18 U.S.C. § 115(a)(1)(B) differentiates that statute from 18 U.S.C. § 111(a)(1). Not only does § 115(a)(1)(B) require the government to prove beyond a reasonable doubt that the defendant threatened certain action against a government official but also that the defendant made such a threat for the *specific purpose* of interfering with the performance of official duties or of retaliating for the performance of such duties.

*United States v. Veach*, 455 F.3d 628, 633 (6th Cir. 2006) (emphasis added); *see also*

*United States v. Stewart*, 420 F.3d 1007, 1017 (9th Cir. 2005) (holding "by its express

language, section 115(a)(1)(B) contains a specific intent element: it punishes only threats

made regarding enumerated officials with the intent to impede, intimidate, interfere with,

or retaliate against such officials on account of the officials' performance of official

duties").

Implicit in the specific intent to impede, intimidate, or interfere with a federal

officer performing official duties is the assailant's knowledge that his target is a federal

officer or is performing official duties. *See*, *e.g., United States v. Veach*, 455 F.3d at 631

(defendant threatened two United States Park Rangers multiple times after they

responded to an accident scene, performed field sobriety tests, and transported defendant

to the hospital); *United States v. Fenton*, 30 F. Supp. 2d 520, 522 (W.D. Pa. 1998)

(defendant sought federal funding from United States Representative John Murtha for

20

economic recovery plan before later stating "that he was going to shoot Congressman Murtha's head off").

When Battle testified on cross-examination, he seemed to acknowledge and understand that an arrest for § 115(a)(1)(B) requires the perpetrator to know that his victim is a federal officer. Battle maintained that King knew he was a federal officer:

> [COUNSEL FOR STATE]: Don't you know that in order to be arrested for interfering with and threatening a federal agent, [King] has to know you're a federal agent?
>
> [BATTLE]: My belief is that he knew I was a law enforcement officer.

However, Battle then admitted that it wasn't until the "bust your head" statement that Battle confronted King and announced that he was a law enforcement officer.

Once again, Battle implied that he could not arrest King for statements he made before he knew that Battle was a law enforcement officer:

> [COUNSEL FOR STATE]: Sir, when he said, "I'm going to bust your fucking head," you had not told him you're a federal law enforcement agent; is that right?
>
> [BATTLE]: And at that point, again, I said I was not arresting him at that point.

Once Battle announced his status, Battle testified that the only "threat" King verbalized was "I don't give a fuck who you are":

> [COUNSEL FOR STATE]: "So just to be clear, there was no other threat that he made at that point?"
>
> [BATTLE]: No, sir.

21

On this record, there is no basis to infer that King knew that Battle might be a federal agent at least until Battle announced that he was a law enforcement officer. King's alleged response, "I don't give a fuck who you are," cannot reasonably be interpreted as an illegal threat, especially because King allegedly uttered it when he was holding a grocery bag in each hand while Battle was displaying a handgun.

Finally, Battle argues that King "lunge[d]" at him after he announced that he was a law enforcement officer. Upon reviewing the video of the encounter, however, the court found that no lunge occurred. The finding is not clearly erroneous. Therefore, there is no basis to conclude that King threatened to assault Battle, a federal law enforcement officer, by lunging at him after Battle had drawn a weapon and pointed it at King.

In summary, none of King's statements or conduct after learning that Battle was a federal agent qualified as an assault or threat of assault under § 115(a)(1)(B). For purposes of Supremacy Clause immunity, therefore, Battle did not have authority to act as he did under that statute.

### E. Implied Authority under Federal Law

Battle argues that even if his actions were not expressly authorized by a federal statute, Supremacy Clause immunity still applies because, he says, he was at least acting with "implied authority." His argument relies heavily on *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977).

In *Clifton*, a federal agent and his partner were executing a federal search warrant for a suspect who they believed was armed. *Clifton v. Cox*, 549 F.2d at 724. While exiting the helicopter that transported them to the suspect's house, the agent's partner

22

tripped and fell. *Id.* The agent heard a noise that sounded like gunfire and mistakenly believed that the suspect had shot his partner. *Id.* The agent stormed the house, kicked down the door, and shot and killed the unarmed, fleeing suspect, violating multiple agency regulations in the process. *Id.*

In examining whether the State of California could impose criminal liability on the agent, the court asserted that "a federal official cannot be held personally liable in a civil suit for acts committed within the outer perimeter of his line of duty." *Id.* at 726. "'To be within that perimeter, and therefore absolutely privileged, "it is only necessary that the action bear some reasonable relation to and connection with the duties and responsibilities of the official.""" *Id.* (quoting *Scherer v. Morrow*, 401 F.2d 204, 205 (7th Cir. 1968), *which quoted Scherer v. Brennan*, 379 F.2d 609, 611 (7th Cir. 1967)).

The court added: "notwithstanding the questionable legality of a federal officer's actions, courts [have] recognized the general rule that errors of judgment in what [federal officers] conceive[] to be [their] legal duty will not, alone, serve to create criminal responsibility of a federal officer." *Id.* at 727. However, "[i]f they acted wantonly, with a criminal intent, then they were not acting within the scope of the authority conferred by the laws of the United States." *Id.* at 727 n.9 (quoting *In re Fair*, 100 F. 149, 155 (D. Neb. 1900)).

Applying these considerations, the Ninth Circuit concluded that the agent had authority to act as he did: "even though [Clifton's] acts may have exceeded his express authority, this did not necessarily strip [him] of his lawful power to act under the scope of authority given to him under the laws of the United States." *Clifton v. Cox*, 549 F.2d at

23

728. He committed a grave error of judgment in carrying out his federal responsibilities, but that error did not divest him of immunity.

Relying on *Clifton*, Battle argues that he was acting within the general scope of his duties and that even if he mistakenly exceeded his authority, he did not do so with criminal intent. The State counters that Battle could not have possibly "exceeded" his authority because, unlike Clifton, he was not furthering any federal policy when he drew his weapon and approached King.

The circuit court found that Battle's actions were not motivated by a desire to carry out his official duties, but rather that Battle acted from "personal motive and malice." That finding, which is dispositive of the claim of implied immunity, is not clearly erroneous.

Although Battle characterized his federal duties as "vast," the court reasonably concluded that he, unlike the agent in *Clifton v. Cox*, was not acting within the scope of his duties when he accosted King in a convenience store parking lot. As the circuit court put it, "[Battle] produced his firearm and assaulted [King] more to intimidate [King] and 'stand up for himself,' than to fulfill his obligation to the United States government." In support of this assertion, the court quoted Battle's own testimony, in which he said, "I pretty much was standing up for myself." In the court's view, Battle did not commit a mere error of judgment or misapprehend the scope of his legal duty. Instead, he lost his composure in the face of King's taunts, and he drew his weapon in order to win an argument.

24

Because the court's findings are supported by admissible evidence in the record, it did not err in rejecting the contention that Battle acted with implied authority for the purposes of Supremacy Clause immunity.

### F.    Necessary and Proper Actions

Even assuming that Battle had actual or implied authority to act as he did, he would be entitled to Supremacy Clause immunity only if he did no more than what was necessary and proper for him to do.

When assessing whether a federal officer's actions were necessary and proper, a court must apply both a subjective and an objective standard. *Commonwealth of Kentucky v. Long*, 837 F.2d at 745. The federal agent must have had an honest belief that the actions were authorized, and that belief must have been objectively reasonable under the circumstances. *Id*.

The court found that Battle did not subjectively believe that he was in danger, but instead was acting out of a personal motive, specifically malice. Although Battle testified that he believed himself to be "in a vulnerable predicament" because he had gone to the rear of his car to remove the gas pump, the video evidence showed that Battle walked only to the right front side of his car, and not to the rear. Furthermore, although Battle's training told him to "create space" between himself and his assailant, the court observed that Battle "closed the considerable gap" between himself and King, striding approximately 27 feet (with his weapon drawn) so that he could square off with King, who was leaving the parking lot. In view of this evidence, the court was not clearly

25

erroneous in rejecting Battle's contention that he subjectively believed himself to be in danger.

The court also found that Battle's conduct was not objectively reasonable. King, the court observed, was leaving the parking lot, with shopping bags in his hand. To extricate himself from the situation, all Battle had to do was to remove the gas pump, get in his car, and drive away. Instead, he strode towards King, with a weapon drawn, closing a gap of almost 30 feet and, in the court's words, "exacerbat[ing]" the incident. Worse yet, he claimed, falsely in the court's view, that King had "lunge[d]" at him. Again, in view of this evidence, the court was not clearly erroneous in finding that Battle did not conduct himself in an objectively reasonable manner.

To recapitulate, the court was not clearly erroneous in finding that Battle's actions were neither necessary nor proper. Therefore, even if Battle was acting pursuant to some express or implied grant of federal authority – which, the court correctly concluded, he was not – he could not claim Supremacy Clause immunity from state criminal prosecution.

## II.

We turn to Battle's claims that stem from the admission of the bodycam footage showing Sgt. Degele's interview with King.

At trial, the court admitted the portion of Sgt. Degele's bodycam footage that showed his interview with King outside of the convenience store. Battle objected to the admission of the footage on the ground that King's statements were inadmissible hearsay. In overruling the objection, the court stated that defense counsel opened the door to the

26

admission of the footage with the questions that he posed to Sgt. Degele on cross-examination.

The State was apparently unable to locate King, as he did not testify at trial. Nonetheless, the jury was able to hear King's account of the confrontation when the State played the bodycam footage.

Battle argues that the court erred. We agree.

## A. Hearsay

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). "Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Md. Rule 5-802.

One of "[t]he threshold questions when a hearsay objection is raised [is] . . . whether [the evidence] is offered for the truth of the matter asserted." *Stoddard v. State*, 389 Md. 681, 688-89 (2005). The State contends that King's statements were not offered for truth of the matter asserted – i.e., they were not offered "to prove that King's version of the incident was true." Rather, the State argues that the recording was offered to "show King's coherent demeanor" in order to counter defense counsel's insinuation that King might have been on drugs. The State maintains that defense counsel's questioning "placed King's demeanor at issue," and thereby "opened the door" to playing the bodycam interview.

The record refutes the State's contention that the court allowed the State to play the bodycam interview solely for the nonhearsay purpose of showing King's coherent

27

demeanor. When denying Battle's motion for a judgment of acquittal, the court itself referred explicitly to "the footage with regard to the encounter of the police officer with the purported victim in the case," in support of its ruling that an assault by Battle had occurred. In other words, the court relied on the bodycam footage as substantive evidence of Battle's guilt when it denied his motion for a judgment of acquittal.

Furthermore, during its rebuttal closing argument, the State addressed King's absence by inviting the jury to consider what he had to say: "It's unfortunate he's not here. *You heard what he had to say*. You heard exactly what he had to say on the stand there. He's not here. He's not here." (Emphasis added.) In referring to "what he had to say," the State was unquestionably referring to King's statements in the bodycam footage.[6]

The State conceded at oral argument that one cannot "open the door" to hearsay. "The open door doctrine 'authorizes admitting evidence which otherwise would have been irrelevant in order to respond to . . . admissible evidence which generates an issue.'" *State v. Robertson*, 463 Md. 342, 352 (2019) (quoting *Clark v. State*, 332 Md. 77, 84 (1993)). "In short, the doctrine 'makes relevant what was irrelevant[.]'" *State v. Robertson*, 463 Md. at 352 (quoting *Conyers v. State*, 345 Md. 525, 546 (1997)). "The 'open the door' doctrine does not, however, permit the admission of incompetent evidence – evidence that is inadmissible for reasons other than relevancy."

---

[6] On another occasion, the State referred to "the video evidence of what happened." In these comments, it is unclear whether the State was referring to the video footage from the store, the bodycam footage of the interview with King, or both.

*Daniel v. State*, 132 Md. App. 576, 591 (2000); *see Conyers v. State*, 345 Md. at 546.

In this circumstance, we conclude that the circuit court admitted the bodycam footage of the interview with King at least in part to prove the truth of the matters asserted therein. The State points to no hearsay exception to justify the introduction of King's statements. The court erred, therefore, in permitting the introduction of those statements.

## B. Confrontation Clause

Battle argues that the admission of King's recorded statements violated his rights under the Confrontation Clause of the Sixth Amendment. The State responds that Battle did not preserve this issue. In our judgment, Battle adequately preserved his objection, On the merits, we agree that the admission of King's hearsay statements violated his confrontation rights.

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him[.]" U.S. Const. amend. VI. "The 'main and essential purpose' of the Confrontation Clause is to ensure that the defendant has an opportunity for effective cross-examination of adverse witnesses, 'which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.'" *Taylor v. State*, 226 Md. App. 317, 332 (2016) (quoting *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)).

The Supreme Court has addressed the close relationship between the Confrontation Clause and hearsay. *See Ohio v. Roberts*, 448 U.S. 56, 62-65 (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). "The

29

historical evidence leaves little doubt . . . that the Clause was intended to exclude some hearsay." *Ohio v. Roberts*, 448 U.S. at 63; *accord Dutton v. Evans*, 400 U.S. 74, 76 (1970) (hearsay rules and the Confrontation Clause "stem from the same roots"); *California v. Green*, 399 U.S. 149, 155 (1970) ("[h]earsay rules and the Confrontation Clause are generally designed to protect similar values"); *Collins v. State*, 164 Md. App. 582, 605 (2005) (recognizing the interrelationship between the two rules).

The Confrontation Clause ensures that:

> "the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Ohio v. Roberts*, 448 U.S. at 64 (quoting *Mattox v. United States*, 156 U.S. 237, 242-43 (1895)).

Nonetheless, "it is well-settled that the two grounds are not synonymous or coextensive; thus, objecting on one ground does not preserve the other ground." *Collins v. State*, 164 Md. App. at 605-06. Thus, we turn first to the question of whether Battle adequately preserved his contentions under the Confrontation Clause.

In response to the State's desire to show the jury Sgt. Degele's interview with King, Battle's counsel objected, saying: "Just because I said, 'Did you search this guy,' that doesn't allow [the State] to bring a hearsay statement from somebody else, from a witness that apparently he has no intention of producing." The State responded, "That's correct." We interpret the State's response as a confirmation that it had no intention of producing King.

30

"The preservation requirement is intended to prevent the trial court from being sandbagged by unseen error." *Jordan v. State*, 246 Md. App. 561, 586, *cert. denied*, 471 Md. 120 (2020). Defense counsel's objection to the use of a "hearsay statement . . . from a witness that [the State] has no intention of producing" suggested, tangentially, a potential Confrontation Clause problem. In the circumstances of this case, therefore, we are satisfied that Battle's hearsay objection, as stated, was sufficient to preserve the closely related issue of whether the admission of the out-of-court statement violated his Sixth Amendment right of confrontation. *See*, *e.g.*, *Morris v. State*, 418 Md. 194, 209 (2011) (holding that defendant's Confrontation Clause claim was "adequately, if not inarticulately preserved" for appellate review).

Turning to the merits, "[w]e review the ultimate question of whether the admission of evidence violated a defendant's constitutional rights without deference to the trial court's ruling." *Taylor v. State*, 226 Md. App. 317, 332 (2016); *see Hailes v. State*, 442 Md. 488, 506 (2015) (applying de novo standard of review to appeal based on Confrontation Clause).

In *Crawford v. Washington*, 541 U.S. 36 (2004), "the Supreme Court redefined many of the core principles for evaluating whether a criminal defendant has the right to require the prosecution to produce the declarants of extrajudicial statements so that the defendant can confront and cross-examine them." *Taylor v. State*, 226 Md. App. at 333. In general, under *Crawford*, a court must exclude "testimonial" hearsay unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine that witness. *Id*. at 336 (citing *Crawford v. Washington*, 541 U.S. at 54).

In the present case, because King was unavailable and Battle apparently had no previous opportunity to cross-examine him, our decision turns on whether King's hearsay statements were "testimonial" under *Crawford*. We conclude that they were.

In two cases decided shortly after *Crawford*, the Supreme Court delineated the circumstances in which statements would or would not be deemed "testimonial" when they were made to police officers during or shortly after the commission of an alleged crime.

In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the Court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." In *Davis*, the declarant was speaking to a police operator, on a 911 call, about acts of domestic violence "*as they were actually happening*." *Id.* at 827. She was not describing past events to the police investigators. *Id.* Although the 911 operator was questioning her, the "primary purpose" of the questions "was to enable police assistance to meet an ongoing emergency." *Id.* at 828. "She simply was not acting as a *witness*; she was not *testifying*." *Id.* (emphasis in original). As her statements were not testimonial, the trial court did not violate the defendant's right of confrontation by admitting them into evidence.

In contrast, the Court determined that statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. Thus, in *Davis*'s companion case,

32

*Hammon v. Indiana*, the police found "no emergency in progress" when they responded to a complaint of domestic violence. *Id.* at 829. The officers interrogated both spouses in separate rooms, away from one another. *Id.* at 830. "Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Id.* "And both took place some time after the events described were over." *Id.* In these circumstances, "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.* As the statements were, therefore, testimonial, the trial court violated the husband's right of confrontation by admitting the wife's statements.

In the present case, "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct[.]" *Id*. at 829. By the time the police had arrived on the scene, there was no "ongoing emergency." The alleged assault had already taken place, and King had been separated from Battle, who had surrendered his badge and firearm and was standing by his car some distance away in the presence of several other officers. Each was interviewed separately by Sgt. Degele. The officers had even allowed Battle to use the convenience store rest room, without supervision.

Sgt. Degele's questions to King — "What happened?" and "What did he say to you?" — were clearly meant to gather facts about a past criminal conduct and not meant to abate an ongoing emergency. Furthermore, King's account of past events and his desire to "press charges" denote the same – that the "emergency" was over and that any criminal conduct had concluded. The exchange took place "some time after the events

33

were over," and the interrogation was designed to elicit "what happened," in the past tense. *Davis v. Washington*, 547 U.S. at 830. "Objectively viewed, the primary, if not indeed the sole purpose of the interrogation was to investigate a possible crime[.]" *Davis v. Washington*, 547 U.S. at 830.

In sum, the relevant inquiries from *Crawford* and *Davis* lead us to conclude that King's statements were testimonial. Therefore, we hold that the circuit court erred in admitting King's testimonial hearsay statements as played through Sgt. Degele's bodycam footage in violation of Battle's constitutional right to Confrontation.

## C. Harmless Error

Because we have concluded that the circuit court erred in admitting inadmissible hearsay in derogation of the rules of evidence and Battle's right of confrontation, we must reverse the conviction unless the error was harmless beyond a reasonable doubt. *Dionas v. State*, 436 Md. 97, 108 (2013).

"[H]armless error review 'is the standard of review most favorable to the defendant short of an automatic reversal.'" *Dionas v. State*, 436 Md. at 109 (quoting *Bellamy v. State*, 403 Md. 308, 333 (2008)). A "'reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.'" *Morris v. State*, 418 Md. at 221-22 (2011) (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)). "'[T]he burden is on the State to show that [the error] was harmless beyond a reasonable doubt' and did not influence the outcome of the case." *State v.*

*Dove*, 415 Md. 727, 743 (2010) (quoting *Denicolis v. State*, 378 Md. 646, 658-59 (2003)) (alteration in original).

In the circumstances of this case, we cannot say that the error was harmless beyond a reasonable doubt. By playing the recording of King's statements to Sgt. Degele, the State was able to get the absent victim's account before the jury, while preventing Battle from challenging King's credibility in cross-examination. "[W]here credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness'[s] credibility is not harmless error." *Dionas v. State*, 436 Md. at 110.

## CONCLUSION

The circuit court did not err in denying Battle's post-judgment motion to vacate the jury verdict on the ground that he has Supremacy Clause immunity from prosecution. Accordingly, we affirm the judgment in Case No. 485, September Term, 2020.

The court, however, did commit prejudicial error in admitting King's hearsay statements. Accordingly, we reverse the judgment in Case No. 1654, September Term, 2019, and remand the case for a new trial.

**IN CASE NO. 1654, SEPTEMBER TERM, 2019, THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS REVERSED; THE CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS ARE TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

35

**IN CASE NO. 0485, SEPTEMBER TERM, 2020, THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS ARE TO BE PAID BY APPELLANT.**